STATE OF MINNESOTA

IN SUPREME COURT

A13-1461

Court of Appeals                                                                                                    Anderson, J.

In the Matter of Reichmann Land and
Cattle, LLP.

Filed:  July 29, 2015
Office of Appellate Courts

_____

Lori Swanson, Attorney General, Ann E. Cohen, Assistant Attorney General, Saint Paul, Minnesota, for appellant/cross-respondent Minnesota Pollution Control Agency.

Gary W. Koch, Matthew C. Berger, Gislason & Hunter LLP, New Ulm, Minnesota, for respondent/cross-appellant Reichmann Land and Cattle, LLP.

_____

S Y L L A B U S

1.      A facility that uses tracts of land to stable and feed cattle during the winter is not an "animal feeding operation" under 40 C.F.R. § 122.23(b)(1) (2014), if the facility grows crops on the same land in the normal growing season.

2.      A facility that uses tracts of land to stable and feed cattle during the winter does not satisfy the "pasture" exemption, Minn. Stat. § 116.07, subd. 7d (2014), if no vegetative cover remains on the land at the beginning of the growing season.

Affirmed.

O P I N I O N

ANDERSON, Justice.

The question presented by this case is whether a farm must obtain federal or state pollution discharge permits for using fields as cropland in the summer and as an animal feeding site during the winter. We conclude that the winter feeding facility managed by respondent/cross-appellant Reichmann Land and Cattle, LLP ("Reichmann") is not an "animal feeding operation," as defined by 40 C.F.R. § 122.23(b)(1) (2014), and therefore Reichmann need not obtain a national-pollutant-discharge-elimination-system permit ("NPDES permit"). We also conclude that because Reichmann does not meet the "pasture" exemption in Minn. Stat. § 116.07, subd. 7d (2014), it must obtain a state-disposal-system permit ("SDS permit"). We therefore affirm the court of appeals.

Reichmann is a 4,000-acre farm in Pope County that grows row crops and operates two registered cattle feedlots, a trucking business, and a grain-grinding business. In addition to the registered feedlots, Reichmann has used some of its cropland as a winter feeding facility for cattle since the 1990s. After the fall harvest each year (in November or December), Reichmann places cattle on four tracts of cropland totaling 416 acres. During the winter months, cattle consume crop residues that remain on the land after harvest. Reichmann augments the diet of the cattle with "supplemental feed," which provides at least 90 percent of the daily nutritional needs for the cattle. In the spring, Reichmann removes the cattle from the winter feeding fields and plants crops on those same fields during the "normal growing season," which spans from the time of spring

2

planting (late April or early May) until the first frost in the fall. Reichmann keeps between 2,000 and 3,500 cattle on its winter feeding fields each year.

Since 2001, appellant/cross-respondent Minnesota Pollution Control Agency (MPCA) has taken the position that Reichmann's winter feeding practices allow a discharge of pollutants and therefore require an NPDES or SDS permit. When Reichmann and the MPCA were unable to reach an agreement to decrease the operation's pollution levels, the MPCA issued a draft administrative order on March 22, 2011, requiring Reichmann to obtain NPDES and SDS permits or discontinue the winter feeding operation. Reichmann requested a contested case hearing that began in October 2012 before an administrative law judge (ALJ). At the center of the dispute was whether Reichmann maintained a vegetative cover on its winter feeding fields while the cattle were present. MPCA experts stated that Reichmann's cattle typically consumed almost all crop residue by January of each year. Any remaining vegetation was "soiled by urine and solid manure and [wa]s not suitable for forage," or was removed when Reichmann scraped manure from the fields. Reichmann's owner, however, testified that cattle would regularly graze on forage and crop residue throughout the winter. Reichmann's expert also believed that forage was maintained throughout the winter, although he never visited the farm during the winter and based his testimony on photographs taken by the MPCA.

The MPCA also presented evidence that Reichmann has discharged pollutants from its winter feeding fields. MPCA inspectors took water samples from the fields and an adjacent stream, and the inspectors concluded that the water contained pollutants. Photographs of Reichmann's winter feeding fields showed "ponded water" that

3

discharged into an inlet and road ditch. The MPCA also presented computer-modeling evidence that predicted a discharge of pollutants.

The ALJ concluded that Reichmann's winter feeding fields constitute a "concentrated animal feeding operation" due to the large numbers of cattle and lack of adequate vegetation sustained during the winter when cattle are present. *See* 40 C.F.R. § 122.23(b). The ALJ also determined that Reichmann's winter feeding fields are not pastures as defined by Minn. Stat. § 116.07, subd. 7d, because the fields lack vegetation during the winter and the cattle are not "allowed to forage." The Commissioner of the MPCA adopted the findings and conclusions of the ALJ with minor modifications. Reichmann was therefore required to apply for an NPDES/SDS permit.[1]

Reichmann appealed the Commissioner's decision, and the court of appeals affirmed the Commissioner's conclusion that Reichmann must apply for an SDS permit. *In re Reichmann Land & Cattle, LLP*, 847 N.W.2d 42, 48 (Minn. App. 2014). Although the court concluded that the Commissioner erred by examining the type of vegetation on Reichmann's feeding fields only in the winter, it agreed that Reichmann's winter feeding fields are not pastures because cattle are not "allowed to forage." *Id.*; *see* Minn. Stat. § 116.07, subd. 7d(b). But the court reversed the Commissioner's requirement that Reichmann must apply for an NPDES permit. *In re Reichmann*, 847 N.W.2d at 50. The court concluded that 40 C.F.R. § 122.23(b)(1) unambiguously provides that fields serving as cropland in the summer are not an animal feeding operation, regardless of whether

---

[1]     A facility that obtains an NPDES permit need not acquire an SDS permit. Minn. R. 7001.1010 (2013).

animals are present on the fields in the winter. *In re Reichmann*, 847 N.W.2d at 49. The court of appeals therefore held that the Commissioner erred by considering only the time period when Reichmann's cattle were present on the fields. *Id.*

I.

We turn first to whether Reichmann must obtain an NPDES permit, which requires an examination of 40 C.F.R. § 122.23(b)(1). Review of a state agency's interpretation of a federal regulation that the agency "is charged with enforcing and administering" is a question of law that we review de novo. *In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance for the Discharge of Treated Wastewater*, 731 N.W.2d 502, 513, 516 (Minn. 2007). We begin by determining whether the regulation is "clear or ambiguous on its face." *Id.* at 516. When making this determination, we "construe rules 'as a whole' " and interpret words and sentences "in the light of their context." *Troyer v. Vertlu Mgmt. Co./Kok & Lundberg Funeral Homes*, 806 N.W.2d 17, 24 (Minn. 2011) (quoting *State v. Gaiovnik,* 794 N.W.2d 643, 647 (Minn. 2011)). "[A] regulation is ambiguous if it is unclear or reasonably susceptible to more than one reasonable interpretation." *Annandale*, 731 N.W.2d at 517. If the regulation is ambiguous, we generally defer to the agency's interpretation of the regulation, if its interpretation is reasonable.[2] *Id.* at 516; *see also Auer v. Robbins*, 519 U.S. 452, 461

---

[2]  Relying on recent Supreme Court concurrences, Reichmann urges us to abandon *Annandale* and refrain from deferring to an agency's interpretation of an ambiguous regulation. *See Decker v. Nw. Envtl. Def. Ctr.*, ___ U.S. ___, 133 S. Ct. 1326, 1339-42 (2013) (Scalia, J., concurring in part and dissenting in part) (urging the Court to reconsider *Auer* deference); *Talk Am., Inc. v. Mich. Bell Tel. Co.*, ___ U.S. ___, 131 S.

(Footnote continued on next page.)

(1997) (holding that a federal agency's interpretation of its own regulation is "controlling unless 'plainly erroneous or inconsistent with the regulation'" (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989))).   If the regulation is unambiguous, however, we "need not defer to the agency's interpretation and may substitute [our] own judgment for that of the agency." *Annandale*, 731 N.W.2d at 516.

The MPCA argues that we should consider the threshold question of ambiguity "within a framework of deference to the administrative agency charged with implementation of the regulation."  The MPCA cites *Annandale*, in which we stated that "deference is warranted only after thoroughly considering multiple factors." 731 N.W.2d at 525.  But the MPCA ignores our clear holding in *Annandale* that we need not defer to an agency's interpretation of an unambiguous regulation.  *Id.* at 516; *see also Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous."); *Resident v. Noot*, 305 N.W.2d 311, 312 (Minn. 1981) ("We do not defer [to an agency interpretation] when the language employed or the standards delineated are clear and capable of understanding.").  We therefore will not resolve the threshold question of ambiguity "within a framework of deference" to the MPCA.

(Footnote continued from previous page.)
Ct. 2254, 2265-66 (2011) (Scalia, J., concurring).  This argument was not raised at the court of appeals and has been inadequately briefed, so we decline to address it.

6

## A.

The Clean Water Act generally prohibits "the discharge of any pollutant by any person." 33 U.S.C. § 1311(a) (2012). Unless otherwise authorized, an NPDES permit is required to discharge pollutants. *Id.* § 1342(a) (2012). Pollutants are discharged when they flow to navigable waters from a "point source," which is defined as "any discernible, confined and discrete conveyance, including but not limited to any . . . concentrated animal feeding operation." *Id.* § 1362(12)(A), (14) (2012).

Congress authorized the EPA to define "animal feeding operation" (AFO) and "concentrated animal feeding operation" (CAFO) through administrative regulation. *See* 33 U.S.C. § 1361(a) (2012) ("The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter.").

> Animal feeding operation ("AFO") means a lot or facility . . . where the following conditions are met: (i) Animals . . . have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-month period, and (ii) Crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility.

40 C.F.R. § 122.23(b)(1). An AFO with at least 1,000 cattle is a CAFO. *Id.* § 122.23(b)(2), (4). There is no dispute that Reichmann keeps at least 1,000 cattle on the lot for more than 45 days in a 12-month period. Thus, Reichmann is a CAFO—and must obtain an NPDES permit—if "[c]rops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of" Reichmann's winter feeding fields.

7

B.

We begin by examining the plain meaning of "sustained in the normal growing season" to determine whether 40 C.F.R. § 122.23(b)(1) is ambiguous. The parties do not dispute that the normal growing season spans from the first planting in the spring to the first frost in the fall, so vegetation must be "sustained" within that period of time. Section 122.23(b)(1) provides no obligations for the nongrowing season and gives no indication that vegetation should be examined at any time other than in the normal growing season.

The MPCA argues, however, that "sustained in the normal growing season" is ambiguous when read in the context of 40 C.F.R. § 122.23(b)(1). *See, e.g.*, *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("[T]he meaning of statutory language, plain or not, depends on context."); *Annandale*, 731 N.W.2d at 518 (noting that "ambiguity 'may be created by the context' " (quoting *State v. Donaldson*, 41 Minn. 74, 80, 42 N.W. 781, 782 (1889))). Section 122.23(b)(1)(i) provides that animals must be present on the land for 45 days during a 12-month period. If the animal requirement in section 122.23(b)(1)(i) is examined in conjunction with the vegetation requirement in section 122.23(b)(1)(ii), the MPCA argues that the phrase "sustained in the normal growing season" must take into account the period during which the animals are present. The MPCA further notes that one definition of the word "sustain" is "to keep up[,] . . . [or] to carry or withstand (a weight or pressure)." *Webster's Third New International Dictionary* 2304 (1976). This definition, the MPCA asserts, necessitates consideration of the "weight or pressure" exerted on the land—here, by the cattle during the winter. The

8

MPCA would therefore conclude that the phrase "sustained in the normal growing season" has more than one reasonable interpretation and is therefore ambiguous.

We are not persuaded. If the EPA had intended the land to be examined at the time animals are present, it could have explicitly said so or indicated that the presence of animals is a relevant consideration. *See, e.g.*, Minn. Stat. § 116.07, subd. 7d (2014) (providing that land is exempt from an SDS permit if "the *concentration of animals* [is] such that a vegetative cover . . . is maintained during the growing season" (emphasis added)). Additionally, the MPCA's interpretation suggests that a winter feeding facility may rely only on post-harvest residues to satisfy the regulation, because that is the only type of vegetation likely to be found on fields in the winter. But the four types of vegetation listed in 40 C.F.R. § 122.23(b)(1)(ii) are joined by the disjunctive conjunction "or," suggesting that the regulation is satisfied if any one type is present. *See State v. Loge*, 608 N.W.2d 152, 155 (Minn. 2000) (stating that the conjunction "or," in general, "require[s] that only one of the possible factual situations be present in order for the statute to be satisfied"); *see also Troyer*, 806 N.W.2d at 24 (" '[N]o word, phrase, or sentence should be deemed superfluous, void, or insignificant.' " (quoting *Krueger v. Zeman Constr. Co.*, 781 N.W.2d 858, 861 (Minn. 2010))).

We also reject the MPCA's proffered definition of "sustain." "[T]he fact that a word has more than one meaning does not necessarily mean it is ambiguous." *Annandale*, 731 N.W.2d at 517. Instead, "the meaning of a word depends on how it is being used." *Id.* The MPCA asserts that the word "sustained" describes the "weight or pressure" animals exert on the land. But 40 C.F.R. § 122.23(b)(1)(ii) does not mention

9

animals; it states that *vegetation* must be sustained in the normal growing season. The word "sustained" clearly refers to vegetation, not animals. The cherry-picked definition advanced by the MPCA therefore does not apply in this context. Instead, we apply the primary definition of "sustained": "maintained at length without interruption, weakening, or losing in power or quality." *Webster's Third New International Dictionary* 2304. Under this definition, vegetation need not be examined in conjunction with a particular "weight or pressure."

Finally, the MPCA urges us to consider other sources when determining whether 40 C.F.R. § 122.23(b)(1) is ambiguous. It cites to *Concerned Area Residents for the Environment v. Southview Farm*, 34 F.3d 114, 123 (2d Cir. 1994), in which the Second Circuit notes in dicta that the vegetation inquiry in 40 C.F.R. § 122.23(b)(1)(ii) performs the dual objectives of ascertaining animal density (because vegetation cannot be sustained with a high density of animals), and assuring the constant presence of vegetation, which "is helpful in absorbing and reducing the amount of pollution." The MPCA also notes that the general purpose of the Clean Water Act is to prohibit the discharge of pollutants, so section 122.23(b)(1)(ii) should not be interpreted to allow Reichmann to pollute in the winter so long as it plants crops in the summer. Additionally, the MPCA urges us to consider two EPA bulletins. The first bulletin "propos[ed] to clarify the regulatory language that defines the term 'animal feeding operations.'" 66 Fed. Reg. 2960, 3004 (Jan. 12, 2001). The proposed definition provided that vegetation must be sustained "during the entire time that animals are present." *Id.* at 3004. But upon "further consideration"—including public comment

10

from the beef cattle industry—the EPA did not amend section 122.23(b)(1). 68 Fed. Reg. 7176, 7188-89 (Feb. 12, 2003). Instead, it published a second bulletin to clarify that "the 'no vegetation' criterion in the AFO definition is meant to be evaluated . . . when the animals are confined." Thus, according to the second bulletin, "use of a winter feedlot to grow crops . . . during periods of the year when animals are not confined would not exclude the feedlot from meeting the definition of an AFO." *Id.*

Although we must interpret 40 C.F.R. § 122.23(b)(1) in the context in which it appears, we will not consider external sources to answer the threshold question of whether the regulation is ambiguous. *See Kratzer v. Welsh Cos.*, 771 N.W.2d 14, 21 (Minn. 2009) ("We look beyond the plain language of the statutory or regulatory provision only if the text is ambiguous."). The Second Circuit did not conduct an initial ambiguity determination, and we decline to consider its policy arguments when the plain language of the regulation is clear. Similarly, although the EPA bulletins express the EPA's desired interpretation of the regulation, they do not have the force of law and cannot replace the text of the regulation itself. *See, e.g.*, *Weiss v. Fujisawa Pharm. Co.*, 464 F. Supp. 2d 666, 673 (E.D. Ky. 2006) (quoting *Christensen*, 529 U.S. at 587). If the EPA intended for the regulation to extend to winter feeding facilities such as Reichmann's, it could have amended the regulation.[3] To the extent that the purpose of the Clean Water Act provides context for section 122.23(b)(1), we note that the Act

---

[3]     Indeed, the EPA's unsuccessful attempt to amend 40 C.F.R. § 122.23(b)(1) counsels against the MPCA's interpretation because it implies that the regulation, as currently written, does not extend to winter feeding facilities.

prohibits some discharges of pollutants but not others. Thus, the mere fact that Reichmann discharges pollutants does not make Reichmann's facility an AFO.

We conclude that a winter feeding facility is not an AFO under 40 C.F.R. § 122.23(b)(1) if it also grows crops on the same land in the normal growing season. Reichmann's winter feeding facility is therefore not an AFO, and we affirm the court of appeals' conclusion that Reichmann is not required to obtain an NPDES permit.

## II.

Next, Reichmann asserts that it is not required to apply for an SDS permit. Analysis of this issue requires interpretation of Minn. Stat. § 116.07, subd. 7d, an issue of law we review de novo. "Our objective in statutory interpretation is to effectuate the intent of the legislature, reading the statute as a whole." *Rohmiller v. Hart*, 811 N.W.2d 585, 589 (Minn. 2012) (citing Minn. Stat. § 645.16 (2014)). In doing so, we "construe words and phrases according to their plain and ordinary meaning," and we "give effect to all of [the statute's] provisions; 'no word, phrase, or sentence should be deemed superfluous, void, or insignificant.' " *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000) (quoting *Amaral v. Saint Cloud Hosp.*, 598 N.W.2d 379, 384 (Minn. 1999)). "When the language of a statute is plain and unambiguous, it is assumed to manifest legislative intent and must be given effect." *Burkstrand v. Burkstrand*, 632 N.W.2d 206, 210 (Minn. 2001).

The Legislature has charged the MPCA with "adopt[ing] standards for the control of the collection, transportation, storage, processing, and disposal of solid waste and sewage sludge for the prevention and abatement of water, air, and land pollution." Minn.

Stat. § 116.07, subd. 2(b) (2014). The MPCA also has authority to "adopt rules governing the issuance and denial of permits for livestock feedlots, poultry lots or other animal lots." *Id.*, subd. 7(g) (2014). The MPCA has determined that an animal feeding facility must obtain an SDS permit if it discharges pollutants and "is capable of holding . . . 1,000 or more animal units," Minn. R. 7020.0405, subp. 1(B)(1) (2013), unless it already has an NPDES permit, Minn. R. 7001.1010 (2013).

The Legislature created an exemption from SDS-permit requirements for animal feedlots that operate on land designated as "pasture":

> (a) . . . [A]n owner or resident of agricultural land on which livestock have been allowed to pasture at any time during the ten-year period beginning January 1, 2010, is permanently exempt from requirements related to feedlot or manure management on that land for so long as the property remains in pasture.
>
> (b) For the purposes of this subdivision, "pasture" means areas where livestock graze on grass or other growing plants. Pasture also means agricultural land where livestock are allowed to forage during the winter time and which land is used for cropping purposes in the growing season. In either case, the concentration of animals must be such that a vegetative cover, whether of grass, growing plants, or crops, is maintained during the growing season except in the immediate vicinity of temporary supplemental feeding or watering devices."

Minn. Stat. § 116.07, subd. 7d.[4] Thus, an animal feeding facility is exempt from obtaining an SDS permit if (1) "livestock graze on . . . growing plants," *or* the fields are used as cropland in the growing season and livestock are "allowed to forage" in the

---

[4] The Legislature enacted a similar exception at Minn. Stat. § 116.07, subd. 7(g), (q) (2014), which also exempts pastures from SDS-permit requirements and provides a definition of "pasture" similar to that in subdivision 7d. Reichmann does not rely on this exemption.

winter; *and* (2) "the concentration of animals [is] such that a vegetative cover . . . is maintained during the growing season."

The court of appeals concluded that Reichmann satisfies the "vegetative cover" requirement of Minn. Stat. § 116.07, subd. 7d(b), because Reichmann "maintains a crop for the duration of the variety's normal growing season." *In re Reichmann Land & Cattle, LLP*, 847 N.W.2d 42, 48 (Minn. App. 2014). But it concluded that Reichmann's winter feeding fields are not pasture because cattle are not "allowed to forage" during the winter. *Id.* For the reasons expressed below, we conclude that Reichmann does not satisfy the pasture exemption because it fails to maintain a vegetative cover during the growing season.[5]

A.

The court of appeals concluded that winter feeding fields qualify as pasture if crops are grown during the summer, because the pasture exemption "unambiguously provides that 'crops' may satisfy the vegetative cover requirement." *In re Reichmann*, 847 N.W.2d at 48. Although the court of appeals determined that Minn. Stat. § 116.07, subd. 7d(b), is identical to 40 C.F.R. § 122.23(b)(1), we are guided to a different

---

[5]     Reichmann argues that this issue is not properly before us because the MPCA did not petition for conditional cross-review of this issue. "It is well settled, however, that a respondent may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, even though the argument may involve an attack upon the reasoning of the lower court or an insist[e]nce upon matters overlooked or ignored by it." *Hunt by Hunt v. Sherman*, 345 N.W.2d 750, 753 n.3 (Minn. 1984); *see also Day Masonry v. Indep. Sch. Dist. 347*, 781 N.W.2d 321, 331 (Minn. 2010) (stating that a respondent may on appeal " 'stress any sound reason for affirmance' " (quoting *Penn Anthracite Mining Co. v. Clarkson Sec. Co.*, 205 Minn. 517, 520, 287 N.W. 15, 17 (1939))).

14

interpretation based on marked differences between the two provisions. The pasture exemption requires that a vegetative cover is maintained "*during* the growing season." Minn. Stat. § 116.07, subd. 7d(b) (emphasis added). "During" is defined as both "throughout the continuance or course of" and "at some point in the course of." *Webster's Third New International Dictionary* 703 (1976). At first glance, both definitions are reasonable here because "during" could require vegetative cover throughout the growing season or merely at some point in the growing season.

Reading the statute as a whole, however, we conclude that the pasture exemption requires vegetation to be maintained "throughout the continuance or course of" the growing season, because that interpretation "give[s] effect to all of [the statute's] provisions." *Schroedl*, 616 N.W.2d at 277; *see Deal v. United States*, 508 U.S. 129, 132 (1993) ("[T]he meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used."). When interpreting a statute, if "context suggests that a group of words have something in common, each word should be ascribed a meaning that is consistent with its accompanying words." *State v. Rick*, 835 N.W.2d 478, 485 (Minn. 2013). The pasture exemption states that "the *concentration of animals must be such* that a vegetative cover . . . is maintained during the growing season." Minn. Stat. § 116.07, subd. 7d(b) (emphasis added). A high concentration of animals in the winter will result in all of the vegetation being eaten, leaving no vegetative cover at the start of the growing season. If the pasture exemption required vegetation only "at some point" in the growing season, then the winter grazing activity would be irrelevant so long as vegetation was established later, and the statute's reference to the concentration of

15

animals would be rendered " 'superfluous, void, or insignificant.' " *Schroedl*, 616 N.W.2d at 277 (quoting *Amaral*, 598 N.W.2d at 384). Additionally, the federal regulation is phrased in the negative, *see* 40 C.F.R. § 122.23(b)(1)(ii) ("vegetation . . . [is] not sustained"), whereas the state provision is phrased in the positive, *see* Minn. Stat. § 116.07, subd. 7d(b) ("a vegetative cover . . . is maintained"), suggesting that the state provision includes an affirmative responsibility to "maintain[]" vegetation; merely achieving a vegetative cover at some point is not enough. The pasture exemption therefore plainly and unambiguously provides that vegetation must be maintained throughout the entire growing season, including the period of time after planting when a new vegetative cover has not yet emerged.

Reichmann argues that this interpretation leads to an absurd result because "there will always be a gap between the time that grasses begin to grow in the spring and farm fields are tilled and traditional crops are planted and begin to grow." However, "when the words of a statute are clear, we may not disregard the letter of the law under the pretext of pursuing the law's spirit." *Gassler v. State*, 787 N.W.2d 575, 585 (Minn. 2010) (citing Minn. Stat. § 645.16). Moreover, one MPCA expert testified that it is possible to maintain a vegetative cover of post-harvest residues throughout the winter and into the next growing season, until crops establish a new vegetative cover.

For these reasons, we hold that the pasture exemption requires vegetation throughout the entire growing season, including the period of time between the planting of crops and the establishment of a new vegetative cover. A winter feeding facility

16

therefore qualifies for the exemption only if winter grazing practices allow vegetation to remain on the land at the beginning of the growing season, before crops emerge.

B.

Next, we review the Commissioner's factual finding that Reichmann does not maintain a vegetative cover on its winter feeding fields. When reviewing the decision of an administrative agency, we "attach[] a presumption of correctness" and "defer[] to an agency's conclusions in the area of its expertise." *Cable Commc'ns Bd. v. Nor-West Cable Commc'ns P'ship*, 356 N.W.2d 658, 668 (Minn. 1984). We may reverse or modify the decision of an administrative proceeding, however, if the findings, inferences, or conclusions are arbitrary or capricious, or are "unsupported by substantial evidence in view of the entire record as submitted." Minn. Stat. § 14.69(e)-(f) (2014); *see Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 827 (Minn. 1977) (holding the agency decision must be "lawful and reasonable"). We will affirm agency conclusions even if we may have reached a different conclusion if we were the factfinder. *Cable Commc'ns Bd.*, 356 N.W.2d at 669. But, we will intervene if a "combination of danger signals . . . suggest the agency has not taken a 'hard look' at the salient problems and 'has not genuinely engaged in reasoned decision-making.'" *Reserve Mining*, 256 N.W.2d at 825 (quoting *Greater Bos. Television Corp. v. F.C.C.*, 444 F.2d 841, 851 (D.C. Cir. 1970)).

Here, the record clearly demonstrates that Reichmann's winter feeding fields lacked a vegetative cover at the beginning of the growing season. Two MPCA experts observed that any crop residue remaining on the land after harvest was eaten by the cattle early in the winter or became contaminated by urine and manure. Reichmann had to

17

reestablish a vegetative cover each year by planting new crops, leaving a period of time at the beginning of each growing season during which the fields were devoid of vegetation. Further, one MPCA expert opined that Reichmann's winter feeding fields could not support a vegetative cover at the beginning of the growing season, given the number of cattle grazing on vegetation during the winter. Reichmann's expert disagreed—he testified that fields containing Reichmann's density of cattle could theoretically sustain a vegetative cover throughout the growing season. But Reichmann's expert never visited the feeding fields during the winter; he instead relied on pictures taken by the MPCA. In contrast, one MPCA inspector visited the farm at least seven times over the course of 3 years. The Commissioner also concluded that the prefiled testimony of Reichmann's expert contained several statements that lacked an "adequate basis." "An appellate court cannot judge the credibility of a witness or the weight, if any, to be given to testimony." *Sigurdson v. Isanti Cty.*, 386 N.W.2d 715, 721 (Minn. 1986). The Commissioner therefore did not err by giving more weight to the MPCA's experts than to Reichmann's experts.

The Commissioner did not abuse his discretion by finding that Reichmann's winter feeding fields do not satisfy the pasture exemption, because vegetation is not maintained during the growing season.[6]

---

[6] Although we are skeptical of Reichmann's alternative argument that the cattle are "allowed to forage" on the winter feeding fields, we need not reach this issue.

III.

We conclude that Reichmann need not obtain an NPDES permit because Reichmann's winter feeding facility is not an animal feeding operation as defined by 40 C.F.R. § 122.23(b)(1).  We further conclude that Reichmann is required to obtain an SDS permit because it does not qualify for the pasture exemption, Minn. Stat. § 116.07, subd. 7d.

Affirmed.