# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-2756
_____

Marcellino Pena

*Plaintiff - Appellant*

v.

Bob Kindler; Glen Strom; Freeborn County

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: March 7, 2017
Filed: July 20, 2017

_____

Before WOLLMAN, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Marcellino Pena, a former Freeborn County Assistant Jail Administrator, appeals the district court's[1] adverse grant of summary judgment on claims related to his termination. Specifically, he appeals as to a 42 U.S.C. § 1983 procedural due

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

process claim and as to a Minnesota statutory claim arising under the Peace Officer Discipline Procedures Act, Minnesota Statutes § 626.89 ("PODPA").[2]

Regardless of whether Pena held a constitutionally protected interest in his employment, we conclude the process surrounding his termination satisfied the Due Process Clause. Further, we conclude Pena was not entitled to the additional protections of PODPA given his actual duties as Assistant Jail Administrator and given the fact that Freeborn County (the "County") neither charged him with the duties of general law enforcement nor utilized his services for those purposes. We therefore affirm the judgment of the district court.

I. Background

Long before the events giving rise to the present case occurred, Pena was employed as a sheriff's deputy in general law enforcement. Since 2008, however, he was not employed as a sheriff's deputy. Rather, he was employed and worked full-time as Assistant Jail Administrator, a job that did not require a law-enforcement license, arresting authority, or a weapon and that also did not entail general law-enforcement duties. Pena nevertheless remained licensed by a state law-enforcement board and was permitted to carry a County-issued firearm. He also remained a sworn deputy, even though he was not employed as such on either a permanent or "on-call" basis.

As Assistant Jail Administrator, Pena's duties included overseeing various contract services such as food and health services for the prisoners. When asked in his deposition about his job duties as Assistant Jail Administrator, Pena responded,

_____

[2]PODPA provides enumerated protections such as mandatory disclosures and procedural requirements for hearings related to the discipline of "peace officers" and "part-time peace officers," as defined in Minnesota Statutes § 626.84, subdiv. 1.

"To improve the facility, bring in revenue, cut costs. Just overall improve the facility, what I could do." According to Pena, he performed well in this position and achieved substantial cost savings for the County. Later, he suggested the County become a service provider to the United States Department of Homeland Security's Bureau of Immigration and Customs Enforcement ("ICE"). The County followed his suggestion, and he eventually became responsible for managing a contract with ICE to transport and house immigration detainees.

While employed as Assistant Jail Administrator, Pena occasionally assisted in the transportation of ICE detainees. According to Pena, the contract between the County and ICE required licensed peace officers to handle transportation of ICE detainees. In fact, the only function Pena served that arguably required him to possess a law-enforcement license was the transport of these administrative detainees. Pena, however, admits he was not ordered or instructed to assist in ICE detainee transport. Similarly, the sheriff, Defendant Bob Kindler, denied having instructed Pena to do so.

During his time as Assistant Jail Administrator, Pena allegedly harassed more than one female employee. In addition, Pena publicly advocated for a candidate who lost an election to Sheriff Kindler. Coworkers alleged that Pena advocated for his preferred candidate while in the workplace. The County's participation as a service provider for ICE served as a key issue of disagreement between the candidates.

In June 2012, a supervisor formally reported Pena for harassment of a young female employee. Sheriff Kindler began an investigation. After several different witnesses reported other instances of misconduct by Pena, Sheriff Kindler suspended Pena with pay effective July 21, pending resolution of the investigation. At that time, Sheriff Kindler informed Pena of the general nature of the complaints. On July 23, Pena met with Sheriff Kindler, a County administrator, and the County's human resources director. Pena was told he was being investigated for sexual harassment

and was given a general description of the allegations against him. The investigation continued, and on August 17, Pena received a letter summarizing the allegations. The letter asked Pena to give a statement on August 23, and informed him he could arrange to have legal counsel present.

In a letter dated August 22, Pena asked for a 14-day delay to secure counsel; complained he did not have enough time after receiving the August 17 letter to secure counsel; demanded access to materials such as interviews and recordings related to the allegations; and complained he was unable to adequately prepare or defend himself. He did not invoke PODPA by name. The County denied his request.

Pena appeared at the August 23 appointment without counsel and gave a statement, admitting many of the allegations. Investigators completed their report. In a September 4 letter, Sheriff Kindler told Pena there was sufficient evidence to justify termination, and the County Board of Commissioners (the "Board") would consider his termination at a September 18 meeting. In a follow-up letter, Sheriff Kindler informed Pena he could appear and defend himself at the meeting. Pena did so. The Board considered the matter in closed session, then returned to open session and voted to terminate Pena.

Subsequently, on October 18, 2012, Pena for the first time argued he was a "peace officer" or a "part-time peace officer" entitled to the procedural protections set forth in PODPA. The County determined Pena, employed as an Assistant Jail Administrator rather than as a sheriff's deputy, was not entitled to the procedural protections of PODPA.

Pena appealed his termination to the Minnesota Court of Appeals through a *certiorari* procedure. The Court of Appeals addressed its own jurisdiction, noting specifically its inability to reach issues not contained in the record of termination. Pena v. Freeborn Cty., No. A12-2007, 2013 WL 3868086, at *2 (Minn. Ct. App. July

29, 2013).  The Court of Appeals concluded the record was insufficient to show Pena was entitled to the protections of PODPA.  Id. at *4.  The Court of Appeals also held Pena did not have a property interest in continued employment.  Id.

Pena then brought the present suit asserting a state-law claim for damages under PODPA and several federal statutory and constitutional claims, including a 42 U.S.C. § 1983 claim alleging a due process violation based on a property interest in his employment.  The district court granted summary judgment for the defendants on all claims.  Pena limits his appeal to the PODPA and due process claims.

## II.  DISCUSSION

We review a grant of summary judgment *de novo*, viewing the record in the light most favorable to the non-moving party.  Am. Family Ins. v. City of Minneapolis, 836 F.3d 918, 921 (8th Cir. 2016).[3]

### A.  Due Process

We need not determine whether Pena possessed a property right in his continued employment because the process he actually received before and after his termination satisfied the Due Process Clause.  This conclusion is independent of any claimed right to specific procedural protections under PODPA because

---

[3]In the district court, the defendants asserted a *res judicata* argument, characterizing the Minnesota Court of Appeals *certiorari* proceeding as precluding the present action.  The district court rejected the argument, finding the record and the issues that could have been raised in the *certiorari* proceeding too limited to preclude the current action.  The defendants renew this argument on appeal.  Given our resolution of the parties' arguments on the merits, we do not address the preclusion argument.  See Transcon. Ins. Co. v. W.G. Samuels Co., 370 F.3d 755, 758 (8th Cir. 2004) ("We may affirm a judgment on any ground raised in the district court . . . .").

constitutionally guaranteed procedural protections are not coextensive with state-created procedural protections. Rather, if a state creates a property interest, the Constitution alone defines the process that must be provided to protect that interest pursuant to the Due Process Clause. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985). As the Supreme Court stated:

> If a clearer holding is needed, we provide it today. The point is straightforward: the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty. . . . In short, once it is determined that the Due Process Clause applies, "the question remains what process is due." The answer to that question is not to be found in the [state] statute.

Id. (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

Here, Pena received notice of the general nature of the grievances against him on July 21 or 23. He then received a detailed letter on August 17. At that time, nearly a month had already passed during which he could have secured legal representation. The August 17 letter provided notice and requested that he appear to make a statement on August 23. On August 22, he sought and was denied a delay and access to materials such as recordings and statements. He nevertheless appeared on August 23 and gave a statement. He then attended the Board's meeting nearly a month later where he again had the opportunity to address the claims against him.

To determine whether the process afforded to protect a property right is constitutionally sufficient, it is necessary to assess whether the process is commensurate in scope with the right and the circumstances surrounding elimination of the right. See, e.g., Sutton v. Bailey, 702 F.3d 444, 447 (8th Cir. 2012). In the

-6-

employment context, the Eighth Circuit has had ample opportunity to develop a mode of analysis, resulting in a legal landscape that calls for some type of pre-termination hearing. See id. That pre-termination hearing, however, may involve less rigor if there also exists an opportunity for a post-termination hearing:

> [T]he Due Process Clause requires a pre-termination hearing in some form, but if a post-termination hearing is also available, the pre-termination proceedings "need not be elaborate. . . . The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." [Loudermill, 470 U.S. at 545–46]. The primary purpose of this type of pre-termination hearing is not to "definitively resolve the propriety of the discharge," but to serve as "an initial check against mistaken decisions. . . ." Id. at 545. Following Loudermill, we have consistently held that, where post-termination proceedings are available, "informal meetings with supervisors" may be sufficient pre-termination hearings. Schleck v. Ramsey Cnty., 939 F.2d 638, 641 (8th Cir.1991), quoting Riggins[ v. Bd of Regents of the Univ. of Neb.], 790 F.2d [707,] 711 [(8th Cir. 1986)]; accord Krentz v. Robertson Fire Prot. Dist., 228 F.3d 897, 902–03 (8th Cir. 2000).

Sutton, 702 F.3d at 447.

Importantly, the process provided need not be akin to a court trial with the various protections and access to evidence that such a forum entails. For example, in Sutton, we held oral notice of an offending social media post coupled with "an opportunity to present his side of the story" satisfied the Due Process Clause. Id. at 448. Also, although notice is required, there need not "be a delay between the notice and the opportunity to respond accorded to a public employee." Id. We therefore conclude that the months-long pre-termination notice, the repeated opportunities for Pena to tell his side of the story, the availability of the state's post-termination

*certiorari*-based review procedure, and Pena's actual utilization of these opportunities easily pass constitutional muster.

## B. Applicability of PODPA

PODPA extends procedural protections to "licensed peace officers" and "part-time peace officers" as those terms are specifically defined by statute. See Minn. Stat. § 626.89, subdiv. 1(c) ("'Officer' means a licensed peace officer or part-time peace officer, as defined in section 626.84, subdivision 1, paragraphs (c) and (d), who is employed by a unit of government."); see also id. § 626.89, subdivs. 3–17 (listing protections, creating a cause of action for damages against the governmental entity, and providing for civilian review of disciplinary actions).[4]

---

[4]Minnesota Statutes § 626.84, subdiv. 1, provides:

(c) "Peace officer" means:

(1) [A] an employee or an elected or appointed official of a political subdivision or law enforcement agency [B] who is licensed by the board, [C] charged with the prevention and detection of crime and the enforcement of the general criminal laws of the state and [D] who has the full power of arrest, and shall also include the Minnesota State Patrol, agents of the Division of Alcohol and Gambling Enforcement, state conservation officers, Metropolitan Transit police officers, Department of Corrections Fugitive Apprehension Unit officers, and Department of Commerce Fraud Bureau Unit officers, and the statewide coordinator of the Violent Crime Coordinating Council; and
. . .
(d) "Part-time peace officer" means [A] an individual licensed by the board [B] whose services are utilized by law enforcement agencies no more than an average of 20 hours per week, not including time spent on call when no call to active duty is received, calculated on an annual basis, who has either [C1] full powers of arrest or [C2] authorization to carry a firearm while on active duty. The term shall apply even though

Pena argues he is a peace officer or, at the least, a part-time peace officer. Focusing first upon the definition of "peace officer," we conclude Pena meets all requirements of subdivision (c)(1) other than the requirement we have labeled [C], *i.e.*, that the person be "charged with the prevention and detection of crime and the enforcement of the general criminal laws of the state." Pena was [A] employed by the County and [B] licensed by the Board. Further, the County does not meaningfully contest the assertion that Pena [D] possessed the full power of arrest. The fact that Pena was a sworn deputy appears to speak to this power and may indicate his *availability* to be hired for purposes of general criminal law enforcement. His status as a sworn deputy, however, does not speak to his actual employment status, nor does it speak to the duties or the specific tasks with which he actually was "charged."

Pena asserts that he personally assisted in the transport of ICE detainees. He argues this function demonstrates that he satisfies requirement [C]. In making this argument, he claims that the ICE contract required a licensed peace officer to transport detainees. By his reasoning, if the ICE contract required a licensed peace officer to transport detainees, and if he, in fact, transported detainees, then he must have been a licensed peace officer.[5]

the individual receives no compensation for time spent on active duty, and shall apply irrespective of the title conferred upon the individual by any law enforcement agency.

[5]Throughout his brief and deposition testimony, Pena uses varying terms to refer to law-enforcement personnel without indicating whether he is referring to the specific statutory definitions at issue in this case. Not surprisingly, the defendants' deposition responses reflect a similar looseness with commonly used everyday words that happen also to be at the heart of the statutory interpretation question in this case: officer, peace officer, licensed peace officer, authorized, sworn, etc. This looseness with language gives rise to three arguments that we must reject. First, Pena refers to the ICE contract as requiring "licensed peace officers" to transport detainees, but we see no evidence tending to suggest the ICE contract incorporated the statutory terms at issue in this case. Second, Pena seems to assert that his state-board licensure

We see nothing to suggest the ICE contract incorporates Minnesota Statutes § 626.84. Moreover, there is no reason to conclude that the simple act of transporting federal immigration detainees pursuant to a contract between the County and a federal administrative agency somehow qualifies as "preventi[ng] and detecti[ng] . . . crime and . . . enforc[ing] . . . *the general criminal laws of the state*." Id. § 626.84, subdiv. 1(c)(1) (emphasis added). There is, after all, no reason to presume the immigration detainees were suspected or had been accused of committing Minnesota offenses.

Further, even if performance under the contract to transport and house federal administrative detainees could be characterized as "preventi[ng] and detecti[ng] . . . crime and . . . enforc[ing] . . . the general criminal laws of the state," Pena admits his superiors did not instruct him to perform this function. Rather, Sheriff Kindler testified without rebuttal that he did not instruct Pena to perform this function. The only reasonable inference supported by the current record, then, is that Pena unilaterally took upon himself the task of transporting the administrative detainees. Given this necessary inference, it does not follow that Pena was "charged with" transporting the contract detainees, much less "charged with preventi[ng] and detecti[ng] . . . crime and . . . enforc[ing] . . . the general criminal laws of the state." Id. In reaching this conclusion, we view the term "charged" as unambiguous and as meaning "hired to," or, at a minimum, "instructed by superiors to," as contrasted with an employee's personal election to take on unassigned duties.

---

should be deemed conclusive as to the applicability of PODPA. It is not. And third, Pena points to various statements by Sheriff Kindler and Defendant Strom as "admissions" that PODPA applies. No reasonable juror could view the defendants' statements as intended to address conclusively the statutory provisions at issue herein. More importantly, however, interpretation of statutory language is a question of law for the court. See Wilbur v. State Farm Auto. Mut. Ins. Co., 892 N.W.2d 521, 523 (Minn. 2017). To the extent that we use the term "licensed peace officer" to describe Pena's characterization of the ICE contract, then, we are merely describing Pena's assertions.

To the extent the term "charged" might be deemed ambiguous, however, canons of statutory construction compel the same conclusion. See State v. Rick, 835 N.W.2d 478, 482 (Minn. 2013) ("[I]f a statute is susceptible to more than one reasonable interpretation, then the statute is ambiguous and we may consider the canons of statutory construction to ascertain its meaning."). The separately listed requirements of section 626.84, subdiv. 1(c)(1) must all be met. "Charged," therefore, cannot refer simply to a person's status as being *eligible* to take an action by virtue of a license. Any such interpretation would render the term "charged" surplusage and redundant with the express requirements of [B] licensure and [D] power of arrest. See In re Reichmann Land & Cattle, LLP, 867 N.W.2d 502, 509 (Minn. 2015) ("[W]e construe words and phrases according to their plain and ordinary meaning, and we give effect to all of [the statute's] provisions; no word, phrase, or sentence should be deemed superfluous, void, or insignificant." (second alteration in original) (citations omitted)). Were we to interpret "charged" as argued by Pena, such that it encompasses voluntary or unilateral acts apart from duties or tasks imposed by a superior, the term would effectively be read out of the statute. Quite simply, the definition does not refer to what a person, in fact, does or is licensed to do. It refers to what the person is instructed or required to do.

Pena also argues he was, at the least, a "part-time peace officer." The definition for "part-time police officer" does not use the term "charged with" or reference any particular category of duties. Rather, it uses the term "utilized by law enforcement agencies" and places a cap on the number of hours per week a person can be "utilized" and still be considered a part-time peace officer. Minn. Stat. § 626.84, subdiv. 1(d) ("part-time peace officer" requires that the person's "services are utilized by law enforcement agencies no more than an average of 20 hours per week, not including time spent on call when no call to active duty is received, calculated on an annual basis").

To the extent the term "utilized" can be interpreted as consistent with the term "charged" in section 626.84, subdiv. 1(c)(1), Pena's arguments fail for the reasons just stated. To the extent the term utilized does not require duties to be assigned by a superior or relate to the detection, prevention, or enforcement of the general criminal laws of the state, Pena's arguments fail for a different reason. Without such a limitation, all service must be considered, and it is undisputed that he worked on a full-time basis as Assistant Jail Administrator. Therefore, if the source of Pena's duties and the nature of his services as "utilized" by the County are immaterial, his work in excess of 20 hours per week excludes him from the definition of a part-time peace officer.

## III. Conclusion

Because Pena received constitutionally sufficient process and is not entitled to the additional procedural protections of PODPA, we affirm the judgment of the district court.[6]

_____

[6]Pena filed a motion to supplement the record with an attorney affidavit and a deposition exhibit showing he was a sworn deputy. Because the fact he was a sworn deputy is undisputed and because we acknowledge this fact above, we deny the motion as moot.