STATE OF MINNESOTA

IN SUPREME COURT

A21-1477

Court of Appeals                                                       Thissen, J.
                                                          Concurring, Anderson, J.
                                                        Took no part, Procaccini, J.

In the Matter of the Surveillance and
Integrity Review (SIRS) Appeal by
Nobility Home Health Care, Inc.

                                                         Filed:  January 10, 2024
                                                         Office of Appellate Courts

_____

Ll. Rhyddid Watkins, Martin Hild, PA, Aurora, Colorado, for relator.

Keith Ellison, Attorney General, Drew D. Bredeson, Scott H. Ikeda, Assistant Attorneys General, Saint Paul, Minnesota, for respondent.

John A. Kvinge, Matthew W. Bergeron, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis, Minnesota, for amicus curiae Minnesota First Provider Alliance.

_____

S Y L L A B U S

1.      The meaning of "abuse" in Minnesota Statutes section 256B.064 (2022), includes the failure to maintain health service records as required by law and submitting claims for services for which underlying health service records are inadequate, even if the person did not seek to deceive the Department of Human Services.  Accordingly, the portions of Minnesota Rule 9505.2165 (2021) defining such conduct as "abuse" do not

conflict with the statute and such conduct may be grounds for sanctions under Minnesota Statutes section 256B.064, subdivision 1b, and monetary recovery under Minnesota Statutes section 256B.064, subdivision 1c.

2.     Given the lack of analysis and inadequate record below, we decline to interpret or apply the phrase "improperly paid . . . as a result of" abuse contained in section 256B.064, subdivision 1c—which governs the grounds for monetary recovery—and we remand to the Department of Human Services to permit further evidence to be taken or additional findings to be made in accordance with the applicable law.

Reversed and remanded.

O P I N I O N

THISSEN, Justice.

This case addresses the sanctions and monetary recovery the Commissioner of the Department of Human Services (DHS) may collect from a Medicaid vendor for failure to maintain certain types of paperwork. Minnesota Statutes section 256B.064 (2022) provides that the Commissioner may impose sanctions on, and/or obtain monetary recovery from, a Medicaid vendor for (among other things) "fraud, theft, or abuse in connection with the provision of medical care to recipients of public assistance." Minn. Stat. § 256B.064, subds. 1a(a), 1c.[1] Abuse is not defined in the statute. In its corresponding administrative

---

[1]     In 2023, the Legislature made several changes to Minn. Stat. § 256B.064. Act of May 24, 2023, ch. 70, art. 17, § 44, 2023 Minn. Laws 1, 551–55. The 2023 amendments are not applicable to our consideration of this case. Unless otherwise specified, all references to section 256B.064 will be to the 2022 version of the statute, which reflects the law as it stood throughout the period covered by this case.

2

rules, however, DHS deems "[a]buse" to include "submitting repeated claims, or causing claims to be submitted, from which required information is missing or incorrect," "submitting repeated claims, or causing claims to be submitted, for health services which are not reimbursable under the programs," and "failing to develop and maintain health service records" in accordance with other DHS rules. Minn. R. 9505.2165, subp. 2.A (2021). The DHS rules regarding health service records must be obeyed as a condition of receiving payments through Medicaid. Minn. R. 9505.2175 (2021).

We conclude that the statutory definition of "abuse" includes the failure to maintain health service records as required by law and submitting claims for services for which underlying health service records are inadequate, even if the person did not engage in such conduct in an effort to deceive the Department of Human Services. And based on this interpretation of the statute, we find no conflict between the rule and the statute. We also hold, however, that DHS failed to explain why payments to Nobility were "improperly paid . . . as a result of" the abuse. Accordingly, we remand to DHS for further analysis of that issue.

**FACTS**

The appellant, Nobility Home Health Care, Inc. (Nobility), provides personal care assistant (PCA) services in Minnesota and receives reimbursement for services through Medical Assistance, the DHS Medicaid program. DHS is required to oversee Medicaid payments and monitor for overpayments. *See* 42 U.S.C. § 1396c (requiring that states comply with program requirements to receive federal funding). As part of its oversight of

3

Medicaid, DHS has a Surveillance and Integrity Review Section (SIRS) that conducts audits and investigations into suspected noncompliance with program requirements.

DHS first began investigating Nobility after DHS learned that patients from another PCA agency—Preferred Home Choice Care, LLC (Preferred)—were encouraged to transfer to Nobility. At the time, Preferred was under criminal investigation and DHS suspected that Nobility was a ploy to continue Preferred's business. DHS found no evidence that the transfer of clients from Preferred to Nobility—the justification for the inquiry into Nobility—was a ploy.

As part of the inquiry, however, DHS discovered some issues with the documentation prepared and maintained by Nobility which prompted further investigation (the General Investigation). Nobility cooperated with this investigation. As background, state statute requires PCA agencies to maintain certain documentation, including "time sheets for each personal care assistant" and a personal care plan for each recipient of care, which must be updated annually. Minn. Stat. § 256B.0659, subds. 7, 28(a)(4) (2022); *see also* Minn. R. 9505.2175, subps. 1, 2, 7 (setting forth health service records requirements for PCA providers). Minnesota Statutes section 256B.0659 (2022) requires that care plans include "start and end date[s] of the care plan" and a plan for how the recipient will use PCA services over the course of the year. Minn. Stat. § 256B.0659, subd. 7. Time sheets must include the "full name of personal care assistant and individual provider number," "signatures of recipient or the responsible party," and "arrival and departure times with a.m. or p.m. notations." *Id.*, subd. 12(c)(1), (4), (5).

4

The General Investigation uncovered two categories of problems: problems with Nobility's time sheets and problems with care plan forms. Some of the time sheets lacked a provider ID (a unique identifier for each PCA), some time sheets lacked a signature, and some time sheets had no a.m./p.m. designations. And the General Investigation determined that the care plans for recipients were incomplete and lacked needed information to guide appropriate client care.

While the General Investigation was ongoing, DHS received a complaint that a specific Nobility client, E.B., was not receiving proper care. DHS began a separate investigation into E.B.'s care (the E.B. Investigation) with which Nobility cooperated. Dakota County Adult Protection visited E.B.'s residence; her apartment smelled of cat urine and apparently had not been vacuumed in months. The record, however, also disclosed that E.B. claimed that she was receiving care. The DHS investigator reviewed time sheets relating to E.B.'s care and noted that several appeared to be photocopies of other time sheets because E.B.'s signature stamp appeared in the exact same place on all the documents. Several other time sheet errors were observed, including lack of identification numbers or a.m./p.m. designations, illegible time sheets, and lack of time sheets documenting reported services. The investigation disclosed that multiple PCAs reported hours even though only one PCA was authorized to provide care. In addition, one of E.B.'s PCAs submitted hours for E.B. at the same time she reported hours for another agency. Nobility also failed to create a new 2018 care plan for E.B. after her 2017 care plan expired, so the services that Nobility provided in 2018 were provided without a valid care plan.

At the conclusion of the investigations, DHS sent Nobility a notice seeking a fine and monetary recovery based on three different categories of conduct. For the deficiencies in care plans related to patients other than E.B., DHS imposed a $5,000 fine but did not seek monetary recovery for overpayment.[2] For time sheet deficiencies not pertaining to E.B., DHS sought a monetary recovery of $52,673.65, but no fine.[3] For the time sheet errors and care plan deficiencies relating to E.B., DHS also sought monetary recovery of $273,035.38, but no fine.

Nobility promptly paid the $5,000 fine for care plan deficiencies not related to E.B., so that issue is not before us. In October of 2019, DHS amended the notice. In the amended notice, DHS sought monetary recovery of $57,283.38 for the time sheet errors relating to clients other than E.B. and $273,035.80 for the deficiencies in time sheets and care plans uncovered in the E.B. Investigation.

The administrative law judge (ALJ) held a hearing and heard testimony from a DHS investigator and from Nobility's owner. The investigator testified to each of the grounds for overpayment and identified specific examples of time sheets and care plans lacking proper documentation. DHS's attorney argued that these errors constituted "abuse" and thus DHS is entitled to an overpayment recovery. Nobility's attorney argued to the ALJ that DHS could not seek an overpayment because the violations were all "paperwork

---

[2]    DHS did not explain why it did not seek overpayment recovery for these violations.

[3]    Each of the paperwork errors identified by DHS as grounds for seeking a monetary recovery are violations of state law. The chart attached as Appendix A summarizes the paperwork errors for which DHS sought recovery of overpayments and the statute or rule that requires that paperwork be completed.

errors" and the statute only permits a fine—not monetary recovery of an overpayment—for the first occurrence of paperwork errors.

The ALJ concluded that errors in statutorily required paperwork are "abuse" under the statute and recommended that DHS recover most of the overpayments sought. The Commissioner agreed with the recommendation and ultimately ordered that Nobility return nearly $330,000 to account for the overpayments related to E.B. ($271,505.08) and other clients ($57,129.66).[4]

Nobility appealed the Commissioner's order, arguing that (1) the Commissioner had no authority to recover overpayments for paperwork errors because the statute limits the sanction for first-time paperwork errors to a maximum $5,000 fine, and (2) DHS and the ALJ erred by concluding that the time sheet errors and documentation errors relating to E.B. were "abuse" under the statute. *See In re SIRS by Nobility Home Health Care, Inc.*, No. A21-1477, 2022 WL 3711485, at *2 (Minn. App. Aug. 29, 2022). Nobility also argued that the Commissioner's decision should be reversed because it was unsupported by substantial evidence and was arbitrary or capricious. *Id.* at *4–5, 4 n.2; *see* Minn. Stat.

---

[4]     The ALJ found an error in one $154.08 line item of DHS's overpayment calculation for the first investigation relating to clients other than E.B. The ALJ reduced the overpayment to $57,129.30 accordingly. The Commissioner agreed with the ALJ's conclusion that one line item was erroneous but concluded that the error was a few cents less than the error found by the ALJ. Ultimately, the Commissioner concluded that Nobility must pay $57,129.66 for deficiencies identified in this investigation.

The ALJ also concluded that DHS met its burden to show that Nobility received overpayments relating to the care of E.B. totaling $273,035.80. After the initial notice of overpayment, Nobility agreed to pay $1,530.72 in overpayments for E.B. for hours that a PCA submitted at the same time she reported hours for another agency. The ALJ concluded that Nobility still owed the remaining $271,505.08. The Commissioner did not change the ALJ's calculation on this point.

§ 14.69 (2022) (setting forth criteria for judicial review of administrative decisions). The court of appeals deferred to the Commissioner's definition of abuse and affirmed the Commissioner's order. *In re SIRS*, 2022 WL 3711485, at *5–6. We granted review.

**ANALYSIS**

Nobility's first arguments are primarily issues of statutory and rule interpretation. Nobility argues that section 256B.064 limits DHS to imposing a $5,000 maximum fine—with no opportunity to seek monetary recovery for overpayment—as the sanction for first-time paperwork errors. Next, Nobility challenges DHS's definition of "abuse"—specifically, "submitting repeated claims, or causing claims to be submitted, from which required information is missing or incorrect," "submitting repeated claims, or causing claims to be submitted, for health services which are not reimbursable under the programs," and "failing to develop and maintain health service records as required under part 9505.2175." Minn. R. 9505.2165, subp. 2.A(1), (3), (7). According to Nobility, that definition exceeds what the Legislature intended when it used the word "abuse" in Minn. Stat. § 256B.064. Based on these arguments, Nobility contends that DHS's demand for an overpayment under section 256B.064 for Nobility's first-time paperwork errors must be reversed.

Next, Nobility argues that even if its conduct is held to constitute "abuse" for which monetary recovery for overpayment may be sought, DHS still cannot recoup such payment unless DHS also establishes that the provider was improperly paid because of that abuse. Nobility argues that the Commissioner's decision on this score was unsupported by substantial evidence and arbitrary or capricious.

8

We address these issues below. Before doing so, however, we start with two observations about both Nobility's characterization of the conduct at issue as routine, innocent paperwork errors and what DHS alleged and proved in this case. First, the errors that DHS proved were not merely typographical errors; they were failures to include information in the underlying documentation of services that were specifically required by statute or rule.

Second, it is also true that DHS did not prove (or purport to prove) that Nobility's paperwork errors were designed to deceive DHS into making payments for work not performed. The record does *not* reflect that Nobility failed to provide the services for which it claimed reimbursement.[5] Nor does it reflect that those services were not reimbursable had the underlying paperwork been properly completed and maintained. The only basis for stating that Nobility's claims were not reimbursable for purposes of Rule 9505.2165, subp. 2.A(3), is inadequate underlying recordkeeping. As the ALJ found, DHS only proved that Nobility submitted numerous claims that were not reimbursable due to errors in time sheet documentation. In addition, DHS did not show that the claims Nobility submitted lacked required information or included incorrect information—only that the records in Nobility's files supporting those claims lacked required information or included incorrect information. For this reason, the reliance of DHS on Rule 9505.2165,

---

[5] As noted above, one of E.B.'s PCAs submitted hours for E.B. at the same time she reported hours for another agency. Nobility agreed to the repay DHS the overpayment for those hours and that specific violation is not before us on appeal.

9

subp. 2.A(1) is misplaced; the provision on its face relates to missing information on the claim materials submitted to DHS for reimbursement.

With that understanding of the proceedings before us, we turn to the central question in this case: whether a vendor's failure to maintain health service records as required by law and submission of claims for services for which underlying health service records are inadequate is abuse under section 256B.064, subdivision 1a(a), even if the vendor did not engage in the conduct in an effort to deceive the Department of Human Services. *See* Minn. R. 9505.2165, subps. 2.A(3) (deeming "submitting repeated claims, or causing claims to be submitted, for health services which are not reimbursable under the programs" to be abuse) and 2.A(7) (deeming "failing to develop and maintain health service records as required under" the rules to be abuse).

I.

We start our analysis with an overview of the statute, Minnesota Statutes section 256B.064, and the corresponding administrative rule. We review the meaning of statutes and administrative rules de novo. *City of Waconia v. Dock*, 961 N.W.2d 220, 229 (Minn. 2021); *Johnson v. Darchuks Fabrication, Inc.*, 926 N.W.2d 414, 419 (Minn. 2019).

Minnesota Statutes section 256B.064 governs the imposition of sanctions and monetary recovery for Medicaid vendors. Subdivision 1a(a) lists eight grounds for "sanctions" against a vendor of medical care, including "fraud, theft, or abuse."[6] Minn.

---

[6]    In full, subdivision 1a(a) states:

Stat. § 256B.064, subd. 1a(a)(1)–(8). The only ground that is applicable in this case is abuse; if failure to properly maintain health service records and submission of claims for when records are inadequate are not abuse, then Nobility prevails.

The next subdivision of section 256B.064—subdivision 1b—identifies the sanctions that the Commissioner may impose: "suspension or withholding of payments to a vendor and suspending or terminating participation in the program, or imposition of a fine under subdivision 2, paragraph (f)."[7] *Id.*, subd. 1b. "When imposing sanctions under

---

(a) The commissioner may impose sanctions against a vendor of medical care for any of the following: (1) fraud, theft, or abuse in connection with the provision of medical care to recipients of public assistance; (2) a pattern of presentment of false or duplicate claims or claims for services not medically necessary; (3) a pattern of making false statements of material facts for the purpose of obtaining greater compensation than that to which the vendor is legally entitled; (4) suspension or termination as a Medicare vendor; (5) refusal to grant the state agency access during regular business hours to examine all records necessary to disclose the extent of services provided to program recipients and appropriateness of claims for payment; (6) failure to repay an overpayment or a fine finally established under this section; (7) failure to correct errors in the maintenance of health service or financial records for which a fine was imposed or after issuance of a warning by the commissioner; and (8) any reason for which a vendor could be excluded from participation in the Medicare program under section 1128, 1128A, or 1866(b)(2) of the Social Security Act.

[7]     In full, subdivision 1b states:

The commissioner may impose the following sanctions for the conduct described in subdivision 1a: suspension or withholding of payments to a vendor and suspending or terminating participation in the program, or imposition of a fine under subdivision 2, paragraph (f). When imposing sanctions under this section, the commissioner shall consider the nature, chronicity, or severity of the conduct and the effect of the conduct on the health and safety of persons served by the vendor. The commissioner shall suspend a vendor's participation in the program for a minimum of five years

11

this section, the commissioner shall consider the nature, chronicity, or severity of the conduct and the effect of the conduct on the health and safety of persons served by the vendor." *Id.*

Regarding the "fine under subdivision 2, paragraph (f)" that may be imposed as a "sanction," under subdivision 2, paragraph (f),[8] DHS can issue a fine to a vendor "for failure to fully document services according to standards in this chapter and Minnesota Rules, chapter 9505." When a vendor fails to document services, "[t]he fine for incomplete documentation shall equal 20 percent of the amount paid on the claims for reimbursement submitted by the vendor, or up to $5,000, whichever is less." Minn. Stat. § 256B.064,

---

if the vendor is convicted of a crime, received a stay of adjudication, or entered a court-ordered diversion program for an offense related to a provision of a health service under medical assistance or health care fraud. Regardless of imposition of sanctions, the commissioner may make a referral to the appropriate state licensing board.

[8]     In full, subdivision 2, paragraph (f), states:

The commissioner may order a vendor to forfeit a fine for failure to fully document services according to standards in this chapter and Minnesota Rules, chapter 9505. The commissioner may assess fines if specific required components of documentation are missing. The fine for incomplete documentation shall equal 20 percent of the amount paid on the claims for reimbursement submitted by the vendor, or up to $5,000, whichever is less. If the commissioner determines that a vendor repeatedly violated this chapter, chapter 254B or 245G, or Minnesota Rules, chapter 9505, related to the provision of services to program recipients and the submission of claims for payment, the commissioner may order a vendor to forfeit a fine based on the nature, severity, and chronicity of the violations, in an amount of up to $5,000 or 20 percent of the value of the claims, whichever is greater.

In 2023, the Legislature amended section 256B.064 and renumbered subdivision 2, paragraph (f) as subdivision 2, paragraph (g). Act of May 24, 2023, ch. 70, art. 17, § 44, 2023 Minn. Laws 1, 554.

subd. 2(f). But the fine under subdivision 2(f) can be higher "[i]f the commissioner determines that a vendor repeatedly violated" state statute or rules related to Medicaid. *Id.* In the event of repeat violations, "the commissioner may order a vendor to forfeit a fine based on the nature, severity, and chronicity of the violations, in an amount of up to $5,000 or 20 percent of the value of the claims, whichever is greater." *Id.* Stated more simply, under section 256B.064, subdivision 2(f), the maximum fine for repeated violations is the higher of 20 percent of the value of the claims or $5,000, while the maximum fine when there are not repeat violations is the lesser of 20 percent of the value of the claims or $5,000.[9]

A separate subdivision of section 256B.064—subdivision 1c—authorizes and sets forth the grounds for monetary recovery.[10] Unlike section 256B.064, subdivision 1b—

---

[9] The Legislature has also separately authorized the Commissioner to assess a fine up to $500 on PCA provider agencies that do not consistently complete and keep in the provider agency's file specified required documentation including care plans and time sheets. Minn. Stat. § 256B.0659, subd. 28.

[10] In full, subdivision 1c states:

(a) The commissioner may obtain monetary recovery from a vendor who has been improperly paid either as a result of conduct described in subdivision 1a or as a result of a vendor or department error, regardless of whether the error was intentional. Patterns need not be proven as a precondition to monetary recovery of erroneous or false claims, duplicate claims, claims for services not medically necessary, or claims based on false statements.

(b) The commissioner may obtain monetary recovery using methods including but not limited to the following: assessing and recovering money improperly paid and debiting from future payments any money improperly paid. The commissioner shall charge interest on money to be recovered if the recovery is to be made by installment payments or debits, except when

13

which authorizes the Commissioner to impose sanctions upon the occurrence of the violation—subdivision 1c allows for monetary recovery of an overpayment only upon proof the "vendor . . . has been improperly paid . . . as a result of conduct described in subdivision 1a." Minn. Stat. § 256B.064, subd. 1c. As discussed, the conduct described in subdivision 1a includes "fraud, theft, or abuse." *Id.*, subd. 1a(a).

"Abuse" is not defined in section 256B.064. The Commissioner promulgated a rule—Minn. R. 9505.2165 (2021)—that defines abuse as "a pattern of practices that are inconsistent with sound fiscal, business, or health service practices, and that result in unnecessary costs to the programs or in reimbursements for services that are not medically necessary or that fail to meet professionally recognized standards for health service."[11] Minn. R. 9505.2165, subp. 2.A. After the general definition, the rule lists specific practices that are "deemed to be abuse," including "submitting repeated claims, or causing claims to be submitted, from which required information is missing or incorrect," "submitting

---

the monetary recovery is of an overpayment that resulted from a department error. The interest charged shall be the rate established by the commissioner of revenue under section 270C.40.

[11] The state definition of abuse is consistent with the federal regulation definition of abuse:

*Abuse* means provider practices that are inconsistent with sound fiscal, business, or medical practices, and result in an unnecessary cost to the Medicaid program, or in reimbursement for services that are not medically necessary or that fail to meet professionally recognized standards for health care. It also includes beneficiary practices that result in unnecessary cost to the Medicaid program.

42 C.F.R. § 455.2 (2022). Unlike the state rule, however, the federal rule does not list categories deemed abuse.

repeated claims, or causing claims to be submitted, for health services which are not reimbursable under the programs," and "failing to develop and maintain health service records as required under part 9505.2175." Minn. R. 9505.2165, subp. 2.A(1), (3), (7). The rule is best understood as a general definition with a non-exclusive list of examples. If conduct is not specifically enumerated in the list but falls within the general definition, that conduct would still be "abuse."

With this background, we address, in turn, Nobility's statutory and regulatory interpretation arguments.

A.

We turn first to Nobility's argument that DHS can only sanction it subject to the statutory maximum in subdivision 2(f) of section 256B.064 for first-time paperwork errors and could not separately seek $330,000 as an overpayment for these same infractions. Nobility points to subdivision 2(f) of section 256B.064, which specifically authorizes DHS to assess fines as a sanction if specific required components of documentation are missing. Minn. Stat. § 256B.064, subd. 2(f); *see also* Minn. Stat. § 256B.0659, subd. 28(b) (allowing the Commissioner to "assess a fine of up to $500 on provider agencies that do not consistently comply" with listed paperwork requirements). The statute limits the permissible fine for the first paperwork error to 20 percent of the amount paid on the claim or $5,000, whichever is less, and to $5,000 or 20 percent of the claim, whichever is more, if the applicable statute or rule is "repeatedly violated." Minn. Stat. § 256B.064, subd. 2(f). According to Nobility, additional sanctions are only available for a repeated failure to correct errors. *See* Minn. Stat. § 256B.064, subd. 1a(a)(7) (listing "failure *to correct errors*

15

in the maintenance of health service or financial records for which a fine was imposed or after issuance of a warning by the commissioner" as one ground for imposing sanctions (emphasis added)).

Nobility's argument hinges on the characterization of the $330,000 "overpayment" sought by the Commissioner as a form of "sanction." But this characterization is not consistent with the statute. The statute distinguishes between sanctions and monetary recovery.[12] Imposition of a fine under subdivision 2, paragraph (f), is a sanction. Minn. Stat. § 256B.064, subd. 1b. The other sanctions identified in subdivision 1b as sanctions the Commissioner may impose are "suspension or withholding of payments to a vendor and suspending or terminating participation in the program." *Id.* The sanctions available to the Commissioner under subdivision 1b do not include "monetary recovery." *Id.* Subdivision 1c, which controls the "[g]rounds for and methods of monetary recovery," does not characterize monetary recovery as a sanction; it does not mention "sanctions" at all. *See id.*, subd. 1c. In contrast, that subdivision expressly recognizes that there are circumstances "when the monetary recovery is of an overpayment." *Id.* An "overpayment" is thus a form of "monetary recovery," and distinct from a "fine" or "sanction."[13] *Id.*

---

[12] Aside from the fine imposed for the deficiencies in care plans related to patients other than E.B. (which Nobility did not challenge and which is not before us), DHS imposed no *sanctions* on Nobility in this case.

[13] Moreover, that an "overpayment" is not itself a "fine" or "sanction" is further confirmed by subdivision 1a, which lists as one of those things for which sanctions may be imposed being "failure to repay an overpayment *or* a fine finally established under this section." Minn. Stat. § 256B.064, subd. 1a(a)(6) (emphasis added).

Finally, the respective subdivisions make clear that either monetary recovery, sanctions, or both is available in response to "conduct described in subdivision 1a." *Id.*, subds. 1b, 1c. In other words, the statute has one subdivision for the sanctions available (subdivision 1b) and a separate subdivision for monetary recovery (subdivision 1c) that both apply to the same conduct—the conduct in subdivision 1a. Moreover, the separate subdivision governing the "[i]mposition of monetary recovery and sanctions" makes clear that the Commissioner may seek both sanctions *and* monetary recovery, rather than only one or the other: "The commissioner shall determine any monetary amounts to be recovered *and* sanctions to be imposed upon a vendor of medical care under this section." *Id.*, subd. 2(a) (emphasis added); *see also id.*, subd. 2(a) ("[N]either a monetary recovery nor a sanction will be imposed by the commissioner without prior notice.").

In sum, the statute makes clear that sanctions (which includes fines) are distinct from monetary recovery (which includes overpayment).[14] Accordingly, the limitation in section 256B.064, subdivision 2(f)—which limits the first sanction for failing to properly maintain paperwork to $5,000—does not prohibit DHS from also obtaining monetary

---

[14] Nobility's related argument—that DHS failed to consider the statutorily required factors before imposing a monetary recovery—fails for the same reason. Nobility argues that DHS needed to consider "the nature, chronicity, or severity of the conduct and the effect of the conduct on the health and safety of persons served by the vendor." *See* Minn. Stat. § 256B.064, subd. 1b. The entirety of the sentence cited by Nobility provides, "[w]hen imposing *sanctions* under this section, the commissioner shall consider the nature, chronicity, or severity of the conduct and the effect of the conduct on the health and safety of persons served by the vendor." Minn. Stat. § 256B.064, subd. 1b (emphasis added). As discussed, sanctions are not the same as monetary recovery. And subdivision 1c, which discusses monetary recovery, does not list nature, chronicity, or severity of the conduct and the effect of the conduct on the health and safety of persons served by the vendor as factors to be considered before the commissioner may obtain monetary recovery.

recovery in the form of overpayment for the same conduct (assuming that the other statutory requirements are satisfied).

B.

We now turn to Nobility's argument that the "abuse" it was alleged to have committed in violation of Rule 9505.2165—failure to maintain health service records as required by law and submitting claims for services for which underlying health service records are inadequate—does not constitute "abuse" as required by the governing statute, Minn. Stat § 256B.064, subd. 1a, at least where, as here, it was done with no purpose to deceive DHS. Consequently, Nobility argues, Rule 9505.2165 conflicts with the statute to the extent it includes these paperwork errors within the meaning of abuse.

We review the question of whether a rule conflicts with a statute de novo, because the interpretation of rules and statutes are questions of law. *Minn. Voter's All. v. Off. of Minn. Sec'y of State*, 990 N.W.2d 710, 716 (Minn. 2023). A rule conflicts with a statute when the rule violates the plain terms of the statute or when the rule has no counterpart in the statute and is inconsistent with it. *Id.* When a rule conflicts with a statute, the statute governs. *Special Sch. Dist. No. 1 v. Dunham*, 498 N.W.2d 441, 445 (Minn. 1993) ("It is elemental that when an administrative rule conflicts with the plain meaning of a statute, the statute controls.").

This inquiry thus depends, in the first instance, on determining what the statute means. It is axiomatic that when the language of a statute is unambiguous, we apply the plain language. *Matter of Denial of Contested Case Hearing Requests*, 993 N.W.2d 627, 646 (Minn. 2023). "But when the language is ambiguous, we may, but are not required to,

18

defer to the agency's reasonable interpretation of the statute . . . ." *Id.* Moreover, particularly when the agency's reasonable interpretation of an ambiguous statute has been longstanding, it is ordinarily "entitled to weight," *Minn. Power & Light Co. v. Pers. Prop. Tax, Taxing Dist., City of Fraser, Sch. Dist. No. 695*, 182 N.W.2d 685, 689 (Minn. 1970), and may be used to help ascertain "the intention of the legislature," *see* Minn. Stat. § 645.16(8) (2022).

With this framework in mind, below we begin by assessing whether the language of section 256B.064, subdivision 1a, plainly tells us that the term "abuse" encompasses the alleged conduct of Nobility—a failure to maintain health service records as required by law and the submission of claims for services for which underlying health service records are inadequate where no intent to deceive is shown. *See County of Dakota v. Cameron*, 839 N.W.2d 700, 705 (Minn. 2013) ("[I]f a statute is susceptible to only one reasonable interpretation, 'then we must apply the statute's plain meaning.' " (citation omitted)). Because we conclude that there is more than one reasonable meaning of the word abuse as it is used in the statute, rendering the statute ambiguous on that point, we next turn to other clues as to statutory intent. And although the legislative history is inconclusive, we find that the agency's longstanding and reasonable interpretation of "abuse" is entitled to weight as to the Legislature's intent. Accordingly, there is no conflict between the rule and the statute, and the conduct alleged against Nobility constitutes "abuse" under both the statute and the rule.

1.

Nobility contends that the challenged categories of abuse set forth in the rules do not constitute abuse as that term is ordinarily understood. In support of this argument, Nobility cites common dictionary definitions, the federal government's definition of abuse, and the associated words and surplusage canons. We address these arguments in turn.

a.

"[W]e may consult dictionary definitions as part of th[e] inquiry" into a statute's plain meaning. *State v. Beganovic*, 991 N.W.2d 638, 643 (Minn. 2023). Citing a definition included in *Merriam-Webster's Collegiate Dictionary* and the *Oxford American Dictionary*, Nobility asserts that the ordinary meaning of "abuse" is a corrupt practice or custom. *See Merriam-Webster's Collegiate Dictionary* 6 (11th ed. 2014) (defining abuse as a "corrupt practice or custom"); *Oxford American Dictionary* 7 (3d ed. 2010) (defining abuse as a "corrupt practice").[15] To interpret "abuse" to include innocent errors in the records it was required to maintain, according to Nobility, conflicts with that particular meaning of abuse.

The conduct at issue, failing to maintain health service records as required by law and submitting claims for services for which the underlying health service records are inadequate without intent to obtain payments for improper services or services it did not

---

[15] Nobility also claims that recordkeeping errors made without bad intent or bad effect do not satisfy the ordinary meaning of the word abuse. To support that reading, Nobility relies on a definition of the verb form of the word "abuse"—to "use (something) to bad effect or for a bad purpose; misuse." *Oxford American Dictionary* 7 (3d ed. 2010). That definition is unhelpful because abuse is being used as a noun in section 256B.064, subdivision 1a.

provide, is not a corrupt practice or custom and thus is not abuse under this definition. But the dictionary definition upon which Nobility relies is not the only one.

We acknowledge that some of the other definitions of abuse support Nobility's contention that innocent paperwork errors do not fall within the meaning of abuse. For instance, dictionaries tell us that abuse can mean "a deceitful act," or "physically harmful treatment" or "maltreatment."[16] *Webster's Third New International Dictionary* 8 (2002). None of those definitions would encompass the paperwork errors at issue here.

On the other hand, many dictionaries offer another definition of abuse: "[i]mproper use or handling; misuse." *American Heritage Dictionary* 8 (3d ed. 1992). *Black's Law Dictionary* from around the time the Legislature enacted the language of "abuse" offers yet another definition: "[e]verything which is contrary to good order established by usage." *Abuse*, *Black's Law Dictionary* (5th ed. 1979). A more recent edition of *Black's Law Dictionary* states it more succinctly as "[a] departure from legal or reasonable use; misuse." *Abuse*, *Black's Law Dictionary* (11th ed. 2019). And the dictionaries that provide Nobility's preferred definition also list abuse as improper use. *Merriam-Webster's Collegiate Dictionary* 6 (11th ed. 2014) ("improper or excessive use or treatment"); *Oxford*

_____

[16] Some definitions, similar to maltreatment, emphasize violent harm to living things. *See Oxford American Dictionary* 7 (3d ed. 2010) (defining abuse as "cruel and violent treatment of a person or animal"). This case does not involve claims that Nobility treated any client cruelly or violently, and we do not reach the question of whether such conduct is abuse under section 256B.064, subdivision 1a(a). Our decision about the meaning of abuse in this case—involving quite distinct claims that failure to maintain health service records as required by law and submitting claims based on those inadequate health service records is abuse—does not address the interpretation of abuse in the entirely different context of cruel or violent treatment of a provider's client.

21

*American Dictionary* 7 (3d ed. 2010) ("improper use of something"). These more general definitions seem to encompass what Nobility did in this case—improperly maintaining its health service records in a way that violated the recordkeeping requirements set forth in statute and rule as well as submitting claims for services for which underlying health service records are inadequate without intent to deceive DHS.

Consequently, we conclude that dictionary definitions of abuse on their own do not resolve whether the plain meaning of abuse as used in section 256B.064, subdivision 1a(a), includes failure to maintain health service records as required by law and submitting claims for services for which underlying health service records are inadequate. *See State v. Scovel*, 916 N.W.2d 550, 555 (Minn. 2018) (noting that dictionary definitions are "not foolproof or failsafe"); *State v. Thonesavanh*, 904 N.W.2d 432, 436 (Minn. 2017) (concluding that multiple and conflicting dictionary definitions were "nondefinitive").

b.

The federal government has adopted a statutory definition of abuse which provides:

> [P]rovider practices that are inconsistent with sound fiscal, business, or medical practices, and result in an unnecessary cost to the Medicaid program, or in reimbursement for services that are not medically necessary or that fail to meet professionally recognized standards for health care.

42 C.F.R. § 455.2 (2022). We do not find the federal Medicaid definition of abuse itself to be helpful for understanding the meaning of abuse in section 256B.064, subdivision 1a(a), however, for the simple reason that the federal definition was adopted after the "fraud, theft, or abuse" language in the Minnesota statute was enacted. The statute was enacted in 1980. *See* Act of Mar. 3, 1980, ch. 349, § 6, 1980 Minn. Laws 28, 30. The

federal definition of abuse was adopted in 1983. Medicare and Medicaid Programs; Suspension of Health Care Professionals for Conviction of Program-Related Crimes; Exclusion of Medicaid Providers for Fraud and Abuse, 48 Fed. Reg. 3,755, 3,755 (Jan. 27, 1983) (codified at 42 C.F.R. § 455.2).

c.

Nobility urges us to use the associated words canon (sometimes referred to in Latin as *noscitur a sociis*) to narrow down these conflicting dictionary definitions. The associated words canon is a contextual tool that may be helpful in situations when a particular word has multiple ordinary meanings that may apply. *Cameron*, 839 N.W.2d at 709 (stating that a word in a statute may be "given more precise content by the neighboring words with which [they are] associated" (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008))). The canon operates from a presumption about the ordinary use of language that "words grouped in a list should be given related meanings." *State v. Friese*, 959 N.W.2d 205, 213 (Minn. 2021) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012)); *see also Christian Action League of Minn. v. Freeman*, 31 F.4th 1068, 1073 (8th Cir. 2022) (noting that courts should "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words" (quoting *Yates v. United States*, 574 U.S. 528, 543 (2015) (internal quotation marks omitted))).

We have not been entirely clear whether the associated words canon applies to the threshold inquiry of whether a statute is ambiguous (i.e., whether more than one meaning of a statutory text is reasonable) or whether the canon only applies after we have

23

determined that a statute is ambiguous. *See Friese*, 959 N.W.2d at 213 & n.4 (Minn. 2021) (noting our conflicting precedent on whether the "word-association" canon applies pre- or post-ambiguity). In *State v. Rick*, 835 N.W.2d 478, 484–85 (Minn. 2013), we applied the associated words canon to determine that a statute was ambiguous. *See also Wong v. Am. Fam. Mut. Ins. Co.*, 576 N.W.2d 742, 745 (Minn. 1998) (applying the associated words canon to an otherwise unambiguous statute). We now conclude that the associated words canon—a canon that considers textual clues to understand the meaning of a statutory text—may be used to help in determining whether the text is susceptible to more than one reasonable meaning.[17]

The first step in applying the canon is to discern whether the words surrounding the term we are interpreting share a common quality. If they do, we then assess whether some of the definitions of the word we are interpreting share that quality (and so remain potential

---

[17] *State v. Suess*, 52 N.W.2d 409, 415 (Minn. 1952), does not compel a different result. In *Suess*, we said that "[i]n case the intent of the legislature is not clear, the meaning of doubtful words in a legislative act may be determined by reference to their association with other associated words and phrases." *Id.* Although the analysis is somewhat imprecise, we were not announcing a rule that the associated words canon applied only after we have first determined that a statute is ambiguous. The statute in *Suess* prohibited the use of artificial light to expose wild animals while in possession of a "firearm or other implement whereby big game could be killed." Minn. Stat. § 100.29, subd. 10 (1953). We were responding to an argument that the phrase "or other implement whereby big game could be killed" was unconstitutionally vague. *Suess*, 52 N.W.2d at 415. It is not evident we considered the challenged language to be unclear. Immediately preceding the first sentence quoted above, we stated "*[o]bviously* [the language] refers to some lethal instrument such as a bow and arrow, capable of killing big game animals." *Id.* (emphasis added). Further, we determined that the defendants in *Suess* could not complain about the vagueness of the phrase because they in fact possessed a firearm; accordingly, the meaning of the challenged phrase was not relevant to our decision. *Id.*; *see State v. Bey*, 975 N.W.2d 511, 520 (Minn. 2022) (stating that language in an opinion is dicta when the case is resolved on different grounds).

24

candidates for the meaning of the word as used in the statute) and other definitions do not (and so are eliminated as potential candidates for the meaning of the word as used in the statute). *See Friese*, 959 N.W.2d at 213 (considering the quality that the words "inhale, be exposed to, have contact with, or ingest" in Minn. Stat. § 152.137, subd. 2(b) (2020), have in common and settling on the more general shared quality).

Minnesota Statutes section 256B.064, subdivision 1a(a), provides that DHS may impose sanctions for conduct constituting "fraud, theft, or abuse in connection with the provision of medical care to recipients of public assistance." Minn. Stat. § 256B.064, subd. 1a(a). Nobility observes that the terms "fraud" and "theft" both include an element of bad intent or corrupt practice. Accordingly, Nobility argues that the proper meaning of the word abuse should also be limited to conduct motivated by a bad intent.

We agree that one common quality shared by the words "fraud," "theft," and "abuse" may be acting with bad intent. But it is not the only common quality. Another quality the words share is that each term is used to describe unfair or improper conduct more generally. *See, e.g.*, *Fraud*, *Black's Law Dictionary* (11th ed. 2019) (defining fraud as "[u]nconscionable dealing"); *Theft*, *id.* (defining theft as "[b]roadly, any act or instance of stealing, including larceny, burglary, embezzlement, and false pretenses"). This common quality would be shared with the broader definition of abuse as misuse.

When using the associated words canon, "[t]he common quality suggested by a listing should be its most general quality—the least common denominator, so to speak—relevant to the context." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 196 (2012). The common quality of unfair or improper conduct is more

general than bad intent or corrupt motive. This suggests that we should use the former as the common quality for the words "fraud, theft, or abuse." *See Friese*, 959 N.W.2d at 213–14 (considering the common qualities between "inhale, be exposed to, have contact with, or ingest" and interpreting "be exposed to" based on the more general quality—risks of methamphetamine—rather than the narrower quality of physical touch). This suggests that the broader definition of abuse, meaning misuse, is the stronger interpretation. Although that interpretation is stronger, it does not reduce the word to a single reasonable meaning, so our analysis continues.[18]

Nobility also argues that it would be superfluous to include paperwork errors in the meaning of "abuse" in subdivision 1a(a)(1), because subdivision 1a(a)(7) specifically addresses paperwork errors.[19] But subdivision 1a(a)(7) lists "failure *to correct errors* in the maintenance of health service or financial records for which a fine was imposed or after issuance of a warning by the commissioner." (Emphasis added.) "[F]ailure to correct errors" is not the same thing as having paperwork errors in the first instance. Thus,

---

[18]    Note that the definition of fraud itself seems to swallow theft. *Compare* Minn. R. 9505.2165, subp. 4.A(1) (defining fraud to include "theft in violation of Minnesota Statutes, section 609.52") *with* Minn. R. 9505.2165, subp. 15 (defining theft as "the act defined in Minnesota Statutes, section 609.52, subdivision 2"). These overlapping definitions only add to the interpretive confusion resulting from the Legislature's use of the phrase "fraud, theft, or abuse."

[19]    In addition, Nobility argues that DHS's interpretation would render Minn. Stat. § 256B.064, subd. 2(f), which provides for fines limited to 20 percent of the amount paid on the claims or $5,000 for first-time paperwork errors, superfluous if DHS can recover an overpayment in the same instance. But as discussed in the previous section, overpayments and sanctions/fines are distinct under the statute, so the statute does not foreclose an interpretation of "abuse" that permits both types of recovery.

subdivision 1a(a)(7) does not definitively render it superfluous for the Commissioner to interpret abuse as including "failing to develop and maintain health service records as required" under the rules. *See* Minn. R. 9505.2165, subp. 2.A(7).

The bottom-line takeaway from these confusing interpretive signals is that the meaning of "abuse" in section 256B.064, subdivision 1a(a), is ambiguous as to whether it includes the conduct in this case. *See Tuma v. Comm'r of Econ. Sec.*, 386 N.W.2d 702, 706 (Minn. 1986) ("A statute is ambiguous when it can be given more than one reasonable interpretation."); *Staab v. Diocese of St. Cloud*, 813 N.W.2d 68, 77 (Minn. 2012). One reasonable interpretation of the word abuse in this context is narrower and limited to a corrupt or deceitful action. Another reasonable interpretation of the word abuse in this context is broader and includes misuse or improper use of something. The text and structure of the statute do not point to one single reasonable meaning of abuse that either rules in or rules out Nobility's conduct in this case—improperly maintaining its health service records in a way that violated the recordkeeping requirements set forth in statute and rule as well as submitting claims for services for which underlying health service records are inadequate without intent to deceive DHS—from the scope of the term abuse.

As addressed in the next section, although such ambiguity permits the court to look to the legislative history and other tools of construction, it ultimately seems to be that the Legislature's use of the statutory phrase "fraud, theft, or abuse" in section 256B.064, subdivision 1a(a), provides broad general contours of the types of conduct that may result in sanctions and require repayment of funds in order to preserve the integrity of the system, with the legislative expectation that administrative agencies and courts will fill in the

27

details.[20]  In such circumstances, using pre-ambiguity tools of interpretation that try to narrow in on one specific meaning intended by the Legislature is more difficult and less useful.  *See Village Lofts at St. Anthony Falls Ass'n v. Hous. Partners III-Lofts, LLC*, 937 N.W.2d 430, 437–38 (Minn. 2020) (finding ambiguity where "parsing the language" of the statute "leads in endless circles"); Richard A. Posner, *The Federal Courts: Crisis and Reform* 288 (1985) ("Sometimes a statute will state whether it is to be broadly or narrowly construed; more often the structure and language of the statute will supply a clue.").

2.

Having concluded that the meaning of "abuse" in Minn. Stat. § 256B.064, subd. 1a(a)(1), is ambiguous, we turn to other tools of construction.  *See* Minn. Stat § 645.16 (listing things a court may consider to ascertain the Legislature's intent "[w]hen the words of a law are not explicit").  One place we turn when trying to understand the meaning of an ambiguous statutory term is legislative history.  *Staab*, 813 N.W.2d at 77 (examining legislative history because the statute was ambiguous).  We have scoured the legislative history of both the federal government's use and adoption of the word "abuse" in the Medicaid context[21] and its use and adoption by the Minnesota Legislature.  We have

---

[20]    As discussed in more detail below, this understanding is reflected in the legislation that first enacted the "fraud, theft, or abuse" language.  Act of Mar. 3, 1980, ch. 349, § 6, 1980 Minn. Laws 28, 30.  *See infra* at 31–32.

[21]    The federal government used the word "abuse" in the Medicaid context around the time that the Minnesota Legislature enacted section 256B.064.  But a review of federal usage does not provide clear guidance about what "abuse" meant to federal policymakers.

28

found nothing that provides definitive guidance on whether the Legislature intended the word abuse to be read broadly enough to cover a vendor's failure to develop and maintain health service records as required by law and submission of claims for services for which underlying health records are inadequate when the vendor did not undertake the conduct in an effort to deceive DHS.

The current version of the section 256B.064 does not include a definition of abuse. But when the Minnesota House considered the bill in 1979, an amendment was added in the House Health & Welfare – Social Services Subcommittee to include a definition that "[a]buse, as used in this section, means activity which results in the provision of excessive, unnecessary, or poor quality care to any person for which payment is sought from the state." H.F. 1289, 71st Minn. Leg. 1979 (Comm. on Health & Welfare – Soc. Servs. Subcomm. Minutes, Apr. 12, 1979). The House Committee on Health and Welfare later amended the bill to remove this definition. H.F. 1289, 71st Minn. Leg. 1979 (Comm. on Health & Welfare Minutes, Apr. 20, 1979). This is weak evidence suggesting that the

---

For example, in the 1970s, the federal government defined "abuse" as acts by health care providers that are "inconsistent with accepted, sound medical or business practices resulting in excessive and unreasonable financial cost." B. Dolan & S. Beitler, *Legislating Medicare Fraud: The Politics of Self-Regulation and the Creation of Professional Standards Review Organizations*, 34 J. Pol'y Hist. 475, 500 n.12 (2022) (citing U.S. Dep't of Health, Educ. & Welfare, *Part A Intermediary Manual*, HIM-13 § 3450–52 (1976)). A 1976 House Subcommittee on Health print posited that "[p]ersons abusing programs such as [M]edicare or [M]edicaid expose themselves to various administrative and legal actions, short of criminal prosecution, such as recovery of funds paid and exclusion from program participation." Staff of H. Subcomm. on Health, et al., 95th Cong., *Fraud and Abuse in the Medicare and Medicaid Programs* 1–2 (Comm. Print 1977). Yet, the subcommittee goes on to refer to abuses as "criminal offenses" later in the print, seemingly contradicting its previous definition of abuse, and admits that "abuse is less clearly defined" than fraud. *Id.* at 2, 13.

Legislature intended for abuse to be related to the provision of care to the client, but the Legislature ultimately rejected the amendment and we do not know why. Thus, we cannot rely only on the proposed amendment to discern legislative intent. This legislative history is inconclusive.

But there is another, stronger, clue about statutory intent that we do find helpful. We have said that an agency's interpretation of a statute is ordinarily "entitled to weight" if the interpretation "construes an ambiguous statute and, particularly, if the interpretation is longstanding." *Minn. Power & Light Co.*, 182 N.W.2d at 689; *see also* Minn. Stat. § 645.16 ("When the words of a law are not explicit, the intention of the legislature may be ascertained by considering . . . administrative interpretations of the statute."). This also presupposes that the agency's construction of the ambiguous statute is reasonable. *See Matter of Reissuance of an NPDES/SDS Permit to United States Steel Corp.*, 954 N.W.2d 572, 583 (Minn. 2021) (crediting the agency's interpretation as "reasonable" and "longstanding"). As we have discussed throughout this opinion, DHS interprets the term abuse to include the failure to maintain health service records as required by law and submitting claims for services for which underlying health service records are inadequate, even if the provider did not seek to deceive the Department of Human Services. For the reasons that follow, we conclude that this construction is both longstanding and reasonable, and thus is entitled to weight as to the Legislature's intended meaning of "abuse."

As an initial matter, DHS's interpretation of the term abuse in Minn. R. 9505.2165, subp. 2.A, to include failure to maintain health service records as required by law and submitting claims for services for which underlying health service records are inadequate

30

is not a new development.  Rather, such provisions have been in DHS rules since 1981.

The original rule promulgated by DHS defined abuse as follows:

> A pattern of practice by a provider . . . which is inconsistent with sound fiscal, business, or medical practices, and results in unnecessary costs to the programs, or in reimbursement for services that are not medically necessary or that fail to meet professionally recognized standards for health care. Abuse is characterized by, but not limited to, the presence of one of the following conditions:
>
> . . . .
>
> c.      The repeated submission of claims by a provider for health care which is not reimbursable under the programs, or the repeated submission of duplicate claims.
>
> d.      Failure of a provider to develop and maintain patient care records which document the nature, extent, and evidence of the medical necessity of health care provided.

12 MCAR § 2.064(B)(1) (1981).  *See* 5 S.R. 972, 974 (Dec. 15, 1980) (proposing the new rule).  The current language of the rule was adopted in a 1991 rule revision and has been materially unaltered for 30 years.  15 S.R. 1,579, 1,581 (Jan. 14, 1991).  And, as this language shows and as demonstrated in this case, DHS understood the term abuse to include non-deceitful conduct like the failure to properly maintain health service records.

Further, when the term abuse was first added to section 256B.064, subdivision 1a, in 1980, the Legislature provided that "[t]he *determination of abuse* or services not medically necessary *shall be made by the commissioner* in consultation with a review organization as defined in section 145.61 or other provider advisory committees as appointed by the commissioner on the recommendation of appropriate professional organizations."  Act of Mar. 3, 1980, ch. 349, § 6, 1980 Minn. Laws 28, 30 (emphasis

added). In the same law, the Legislature expressly delegated to the Commissioner the authority to establish in rule:

> general criteria and procedures for the identification and prompt investigation of suspected fraud, theft, abuse, presentment of false or duplicate claims, presentment of claims for services not medically necessary, and false statements or representations of material facts by a vendor of health services, and for the imposition of sanctions against a vendor. The rules relating to sanctions shall be consistent with the provisions of section 256B.064, subdivision 2, and section 6.

*Id.*, § 2, 1980 Minn. Laws 28, 29. The rule set forth in 12 MCAR § 2.064(B)(1) was adopted in response to this legislative directive. And, of course, for more than 40 years, the Legislature has not seen fit to pass legislation to narrow the meaning of abuse to exclude failure to develop and maintain health service records required by law from the scope of the term.

Accordingly, this longstanding construction of abuse by DHS in its rules supports it being given weight as to the Legislature's intended meaning of the term abuse in section 256B.064, subdivision 1a(a)(1).

Whether we will give weight to the agency's interpretation of the ambiguous statutory language also requires that the agency's interpretation is reasonable. *See A.A.A. v. Minn. Dept. of Hum. Servs.*, 832 N.W.2d 816, 823 (Minn. 2013). Nobility asserts that DHS's interpretation of "abuse" in Rule 9505.2165 is unreasonable because it is internally inconsistent. It points out that the rule first includes a general definition of abuse that mirrors the federal Medicaid definition of abuse found in 42 C.F.R. § 455.2:

> [A] pattern of practices that are inconsistent with sound fiscal, business, or health service practices, and that result in unnecessary costs to the programs

32

> or in reimbursements for services that are not medically necessary or that fail to meet professionally recognized standards for health service.

Minn. R. 9505.2165, subp. 2.A. The rule then lists specific practices that are "deemed" to be abuse, including, for instance, "failing to develop and maintain health service records as required under part 9505.2175." Minn. R. 9505.2165, subp. 2.A. Nobility argues that failure to maintain health service records as required by law and submission of claims for services for which underlying health service records are inadequate, standing alone, do not meet DHS's general definition of abuse.

At first glance, Nobility has a point. The general definition in Rule 9505.2165, subpart 2.A—like the federal Medicaid definition, 42 C.F.R. § 455.2 (2022)—requires proof of two things for an act to constitute abuse. First, the act must be a practice inconsistent with sound fiscal, business, or medical practices. Failure to maintain health service records in compliance with laws and regulations—requirements which exist to establish that the services were appropriate, were actually provided, and are covered by Medicaid—reasonably may be considered inconsistent with sound fiscal, business, and medical practices.

Second, the provider's failure to include information required by statute or rule in health service records must "result in unnecessary costs to the programs or in reimbursements for services that are not medically necessary or that fail to meet professionally recognized standards for health service." Minn. R. 9505.2165, subp. 2.A. To meet this part of the general definition, it would not be enough for DHS to prove that a provider failed to maintain its records as required by law; DHS would also have to prove

that the failure to maintain health service records as required by law and submitting claims for services for which underlying health service records are inadequate either resulted in unnecessary cost to the Medical Assistance program or that a provider was paid for services that were not medically necessary or did not meet professionally recognized standards for care. The type of conduct at issue here does not necessarily and on its face meet the second requirement of the general definition of abuse.

Nobility's argument fails, however, because the word "deemed" does *not* require that the specific items in the list be consistent with the general definition. We have not interpreted the statutory term "deemed" in that way. Rather, we have said that the word "deemed" creates a conclusive presumption that the requirements of a statute are met if certain facts exist. *See*, *e.g.*, *First Nat'l Bank of Mankato v. Wilson*, 47 N.W.2d 764, 767 (Minn. 1951); *Smart Choice Health Care Corp. v. Minn. Dep't of Hum. Servs.*, No. A22-0367, 2022 WL 4295330, at *3 (Minn. App. Sept. 19, 2022) (interpreting the rule as requiring that "if one of these 22 [listed occurrences] exists, it constitutes abuse, irrespective [of] whether the first definition is met"). Accordingly, when a provider engages in conduct that the rule "deems" to be abuse, the rule creates a conclusive presumption that the provider committed abuse without regard to the general definition set forth in the rule.

That does not mean that DHS can deem something to be "abuse" in a way that is inconsistent with the *Legislature's intent* when it used the word in the *statute*. But as we have seen, the tools upon which we typically rely to determine the definitive plain meaning of a statutory term are not helpful in this case. Those tools do not allow us to rule out either

Nobility's narrow definition of abuse as corrupt action taken with bad intent (which would exclude from the scope of the term "abuse" the negligent or innocent failure to maintain health service records as required by law and negligent or innocent submission of claims for services for which underlying health service records are inadequate) or DHS's broader definition of abuse (which includes non-deceitful failure to maintain health service records as required by law and submitting claims for services for which underlying health service records are inadequate) under its definition of abuse. Both definitions, including the broader one which covers the conduct at issue in this case, are reasonable. DHS's construction of "abuse" is not unreasonable and entitled to weight.

\* \* \*

Accordingly, we conclude that the term abuse as used in section 256B.064, subdivision 1a(a), encompasses failure to maintain health service records as required by law and submission of claims for services for which underlying health service records are inadequate, even if the conduct is undertaken without a purpose to deceive DHS. Further, because Nobility does not argue that it properly maintained health service records as required by law, we affirm DHS's determination that Nobility committed abuse that may be grounds for sanctions and monetary recovery.

II.

Our conclusion that DHS met its burden to show abuse does not end the analysis. The statute provides that the Commissioner "may obtain monetary recovery from a vendor who has been improperly paid . . . as a result of" abuse or other "conduct described in subdivision 1a." Minn. Stat. § 256B.064, subd. 1c(a). Nobility interprets this language to

35

mean that even if DHS can define minor recordkeeping errors as abuse, it still cannot recoup payment for services unless DHS also establishes that the provider was improperly paid because of that abuse. The Commissioner has not offered any legal interpretation or analysis of the phrase "improperly paid . . . as a result of." Further, in the administrative proceeding, the Commissioner and the ALJ merely concluded, without explanation, that if the Department can establish abuse, recovery of overpayments is appropriate.

The parties' arguments have evolved as this case proceeded on appeal. Given the inadequate briefing as well as the inadequate record, we decline to interpret or apply the statutory language "improperly paid . . . as a result of" abuse in section 256B.064, subdivision 1c(a). *See In re Reichmann Land & Cattle, LLP*, 867 N.W.2d 502, 506 n.2 (Minn. 2015) (declining to reach an issue that was "inadequately briefed"). Instead, we remand the case to DHS " 'to permit further evidence to be taken or additional findings to be made in accordance with the applicable law.' " *In re Restorff*, 932 N.W.2d 12, 24 (Minn. 2019) (quoting *In re A.D.*, 883 N.W.2d 251, 258 (Minn. 2016)).[22]

---

[22] Nobility also asks us to remand the case because DHS failed to explain why it sought an overpayment, as opposed to a fine, for the care plan errors related to E.B. DHS sought only a fine only for care plan errors relating to other clients in the first investigation (an issue not before us) and DHS did not explain how it chose between a fine and an overpayment relative to the claims before us. But DHS did explain why it issued an overpayment order. The Commissioner cites Minn. R. 9505.2215 (2021), as mandating that the Commissioner seek an overpayment. Nobility did not argue that Minn. R. 9505.2215 conflicts with the statute, so we do not address that issue here. We conclude only that DHS's decision to seek an overpayment for the claims at issue on appeal was not arbitrary or capricious because DHS explained why it sought an overpayment for those claims.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the court of appeals and remand to the Department of Human Services for proceedings consistent with this opinion.

Reversed and remanded.

PROCACCINI, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

# APPENDIX A

| Alleged grounds for overpayment | Applicable Provision of Minnesota Statutes section 256B.0659 (2022) or Minnesota Rule 9505.2175 (2021) |
|---|---|
| Expired care plans<br><br>No care plans for clients | Minnesota Statutes section 256B.0659, subdivision 7, requires that "[e]ach recipient must have a current personal care assistance care plan based on the service plan" and that "A new personal care assistance care plan is required annually at the time of the reassessment." |
| No start dates documented on care plans<br><br>No end dates documented on care plans | Minnesota Statutes section 256B.0659, subdivision 7(b)(1), requires that care plans have a "start and end date." |
| No month-to-month usage on care plans | Minnesota Statutes section 256B.0659, subdivision 14(f)(2) requires that a qualified professional include a "month-to-month plan for use of personal care assistance services" in the care plan.<br><br>Minnesota Statutes section 256B.0659, subdivision 15(d), requires month-to-month plans in flexible use plans.<br><br>Minnesota Statutes section 256B.0659, subdivision 7(c), also states that "[t]he month-to-month plan for the use of personal care assistance services is part of the personal care assistance care plan." And subdivision 13 states that a qualified professional shall "develop and monitor with the recipient a monthly plan for the use of personal care assistance services." Minn. Stat. § 256B.0659, subd. 13(b)(2). |
| Responsible parties not documented on care plans, or wrong responsible parties identified | Minnesota Statutes section 256B.0659, subdivision 7(b)(4), requires that care plans include the "name of responsible party and instructions for contact." |
| Emergency plans not documented in care plans | Minnesota Statutes section 256B.0659, subdivision 7(b)(3), requires "emergency numbers, procedures, and a description of measures to address identified safety and vulnerability issues." |
| Back up staffing plans not documented | Minnesota Statutes section 256B.0659, subdivision 7(b)(3), requires "a backup staffing plan." |
| Illegible time sheets | Minnesota Rule 9505.2175, subpart 2.A, requires that the vendor keep records that are "legible at a minimum to the individual providing care." |

| | |
|---|---|
| AM/PM designations undocumented in time sheets | Minnesota Statutes section 256B.0659, subdivision 12(c)(4), requires that the personal care assistant time sheet include "arrival and departure times with a.m. or p.m. notations."<br><br>Minnesota Rule 9505.2175, subpart 7.H(5), requires specific entries into health service records including, as an example, "the time of arrival at the site where personal care services were provided and the time of departure from the site where services were provided, including a.m. and p.m. designations."[1] |
| Provider ID not documented on care sheets | Minnesota Statutes section 256B.0659, subdivision 12(c), requires that "[t]he personal care assistant time sheet . . . [must include the] individual provider number." |
| Responsible party signatures missing from time sheets | Minnesota Statutes section 256B.0659, subdivision 12(c)(5), requires "signatures of recipient or the responsible party." |
| No time sheets for certain dates of service | Minnesota Statutes section 256B.0659, subdivision 12(a), requires that personal care services be documented on a time sheet. |

---

[1] Minnesota Rule 9505.2175, subpart 7, was repealed in 2023. 48 SR 487 (Nov. 20, 2023) and 48 SR 55-57 (July 17, 2023).

ANDERSON, Justice (concurring).

I concur in the result reached by the court but write separately to note that the Department, Nobility, and the public in general would benefit from legislative action that clearly defines the authority of the Department to impose sanctions, or to seek "monetary recovery," for alleged paperwork errors by vendors and proportionately limits that authority consistent with the seriousness of the errors.